**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COUNTY BOARD of ARLINGTON   |
VIRGINIA,   |
2100 Clarendon Blvd. Suite 300   |
Arlington, VA 22201   |
  |
  |
     Plaintiff,   |
  |
     vs.   |     **Civil Case No. _____**
  |
  |
UNITED STATES DEPARTMENT OF   |
TRANSPORTATION   |
1200 New Jersey Avenue, S.E.   |
Washington, DC 20590   |
  |
and   |
  |
HONORABLE RAYMOND H. LAHOOD, |
    in his official and individual capacity,   |
Secretary of the United States Department   |
    of Transportation   |
1200 New Jersey Avenue S.E.   |
Washington, DC 20590   |
  |
and   |
  |
FEDERAL HIGHWAY   |
ADMINISTRATION   |
1200 New Jersey Avenue, S.E.   |
Washington, DC 20590   |
  |
and   |
  |
VICTOR MENDEZ,   |
    in his official and individual capacity,   |
Federal Highway Administrator,   |
1200 New Jersey Avenue, S.E.   |
Washington, DC 20590   |
  |
and   |
  |

VIRGINIA DEPARTMENT OF                    |
TRANSPORTATION                            |
1401 E. Broad Street                      |
Richmond, VA 23219                        |
                                          |
and                                       |
                                          |
HONORABLE PIERCE R. HOMER                 |
   in his official and individual capacity,   |
Secretary of the Virginia Department      |
   of Transportation                      |
Patrick Henry Building                    |
3rd Floor                      |
111 East Broad Street                     |
Richmond, VA 23219                        |
                                          |
      Defendants.                 |

## COMPLAINT

COMES NOW the County Board of Arlington, Virginia ("Arlington County") and, for its complaint against the defendants, states the following:

## INTRODUCTION

1.    Arlington County seeks declaratory and injunctive relief against defendants based on defendants' arbitrary and capricious failure to comply with environmental obligations relating to their submission for approval, and subsequent improvident approval, of a proposed "HOV/HOT" highway project in Northern Virginia, which also is in blatant and intentional derogation of Federal and State anti-discrimination laws, to the direct and unlawful detriment of Arlington County and its residents.

2.    This action arises under and alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*; the Air Pollution Prevention and Control Act ("Clean

Air Act"), 42 U.S.C. §§ 7401, *et seq.*; the Federal-Aid Highway Act ("FAHA"), 23 U.S.C. § 109; Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; 42 U.S.C. § 1983; the 5th and 14th Amendments to the United States Constitution; and Article 1 § 11 of the Commonwealth of Virginia Constitution.

3.　　　In October 2006, pursuant to the Virginia Public-Private Transportation Act of 1995 (as amended), the Virginia Department of Transportation ("VDOT") entered into a partnership with private vendors -- Fluor Virginia, Inc. ("Fluor") and Transurban (USA) Development, Inc. ("Transurban") (collectively "Fluor-Transurban") -- sanctioned and recognized by the Federal Highway Administration ("FHWA"), for the funding, construction and operation of a new transportation facility and operations, involving the introduction of toll lanes and major infrastructure modifications and additions, including but not limited to, exit/entrance ramps, interchanges, parking lots, bus facilities, fly-overs and additional travel lanes along the entire length of the I-95/I-395 corridor in Northern Virginia from Spotsylvania County to the Eads Street/Pentagon Reservation interchange in Arlington County, Virginia (the "Project"). The partnership agreement would cede control of the Commonwealth's public infrastructure to Flour-Transurban, private vendors, for eighty (80) years. Accordingly, Arlington County seeks to stay further implementation of any agreement between VDOT and Fluor-Transurban pending a full and comprehensive environmental, public health and transportation review of the Project's impacts, as required by law.

4.　　　Acting in concert with and for the interests of Fluor and Transurban, VDOT, FHWA and the individual defendants (collectively "defendants"), deliberately, artificially and without reasoned justification, narrowly defined the Project unrelated to the reality of its geographic and environmental scope. The defendants then determined that this

narrowly defined Project could be segmented and be deemed a "Categorical Exclusion" from the comprehensive review and public scrutiny requirements of NEPA and the Clean Air Act. In doing so, defendants ensured that the full environmental and public health impacts along with the potential degradation of the existing transportation system in the corridor and the disparate impact of the Project on minority and low-income communities would not be adequately analyzed, or analyzed at all, and disclosed to the public.

5.     By invoking deliberately deficient, inaccurate and woefully inadequate traffic analyses and environmental reviews to support their determination, the defendants (i) failed to fully, accurately and properly analyze the air quality impacts, and therefore, public health consequences of the Project within and on the adjacent and nearby neighborhoods and communities; (ii) ignored the physical impacts on the general purpose lanes of the existing highway and on local street networks, putting at risk traditional and historic neighborhoods and communities, including Fairlington, Shirlington and Parkfairfax; (iii) failed to provide any analysis of the highly probable and plainly disruptive impacts of the Project on the operation of the existing, highly efficient and environmentally beneficial high occupancy vehicle ("HOV") lanes facility and related, thoughtfully engrained and effective commuter behavior throughout the entire I-95/I-395 corridor; and (iv) did not analyze at all the environmental, public health and societal impacts on low-income and minority communities and vulnerable populations, including schools, day care facilities, and elderly homes and residences, within, adjacent to and nearby the Project.

6.     The defendants deliberately rushed to a substantively and procedurally constrained determination to artificially and unjustifiably "segment" into a so-called "Northern Section" (Prince William County to the Pentagon Reservation in Arlington County) and a so-

called "Southern Section" (Stafford County and Spotsylvania County) the evident and recognized inextricable cohesion and interdependence of the components of the Project. These components also must be viewed -- and have been so viewed in other settings by the defendants -- in the context of and cumulative effects on the regional transportation system, e.g., the Capitol Beltway HOV/HOT project, the 14th Street Bridge into the District of Columbia and local road networks. The artificial and arbitrary segmentation of the Project is evidenced by defendants' relocation of the boundary between the sections to a point further south after the submission and review of the Northern Section.

7.     Like all government agencies, FHWA is prohibited from approving a transportation project unless there first is an environmental analysis of the project. If such a project is likely to impact the environment, the law requires defendants to perform a thorough study of those impacts — either an "Environmental Impact Statement" ("EIS"), detailing those impacts, or an "Environmental Assessment" ("EA") detailing why the project will not have a significant impact on the environment. The purpose is to ensure that any environmental impacts will be considered, both by the agency itself and by the public, during its deliberations on whether to approve the project. Only a small class of projects is considered by law to be so clearly unlikely to impact the environment that even an EA is not required — an agency may declare such projects to be eligible for a "Categorical Exclusion" from such review.

8.     On January 9, 2009, after a contrived and cursory review, outgoing head officials in the previous administration at FHWA announced the agency's determination that it did not need to examine the environmental impacts of the Northern Section because that segmented component of the entire Project was eligible for a "Categorical Exclusion."

9.     The FHWA's determination was not only incorrect, but outlandish and rationally indefensible.  Any reasonable technical analysis of the Project would show that it is likely to worsen air pollution in Arlington County's densely populated communities that border the relevant portions of the I-95/I-395 corridor, by drastically increasing automobile volume and traffic delays and queues.  Indeed, the Project is designed to *encourage* commuters from the farthest-flung exurban "sprawl" communities of Northern Virginia to use this corridor more frequently, without need of carpooling.  Defendants' analysis, which led to their implausible conclusion, was designed in a manner that suggests that its result was predetermined.

10.     There are at least two reasons for the defendants' failure to act rationally.  First, the so-called Southern Section will largely provide the financial support and rational for the entire Project and Fluor-Transurban's private financial imperative which requires the continued expediency for the Northern Section.  FHWA and VDOT have facilitated this expediency by manipulating procedural obligations and substantive requirements of NEPA and the Clean Air Act, and deliberately ignoring elementary notions of constitutional due process and equal protection.  Second, defendants Secretary LaHood, Secretary Homer and Administrator Mendez, in their individual and official capacities, acting under color of law, seek through the deceptive misnomer of "HOT" (High Occupancy Toll) lanes to invidiously and deliberately support, encourage and enable a financially-able, privileged class of suburban and rural, primarily caucasian residents from Stafford and Spotsylvania counties, operating single occupancy vehicles ("SOV"), unimpeded access on toll lanes.  Moreover, they act despite the Project's enormously adverse impact on the safety and health of current HOV users, on the interrelated interests of Arlington County, and with disparate and harmful impact on minority and low-income families within, adjacent to and nearby the Project, especially in the

so-called Northern Section. The public health effects that will likely result from the increases in air pollution from the Project (even the Northern Section taken alone) are scientifically well-documented and include respiratory and cardio-vascular illnesses and cancer.

11. The defendants' January 9, 2009 determination, especially in its definition of the Project, is totally at odds with the precise manner in which this Project has been described and presented in every other official publication, presentation, report and agreement. Prior to and since January 9, 2009, the defendants and Fluor-Transurban have recognized, examined and presented, and continue to do so, a unified proposal that consists of both the Northern Section and the Southern Section -- from Massaponax, Spotsylvania County, Virginia through the Eads Street/Pentagon Reservation interchange in Arlington County. This fact is plain from, among other events elaborated and identified below: (i) VDOT's I-95/I-395 Transit/TDM Study, Final Report (February 29, 2008); (ii) the Project's approval and formal transmittal to plaintiffs and others in May 2007; (iii) the presentation of the full Project to the five (5) counties along the I-95/I395 corridor, the City of Alexandria and regional transportation committees and boards, including the Washington Metropolitan Area Transit Authority, the National Capitol Region Transportation Planning Board, the Northern Virginia Transportation Commission and the Northern Virginia Transportation Authority; (iv) the series of Design Public Hearings in February 2009; and (v) VDOT's presentation at the Commonwealth Transportation Board Workshop, July 16, 2009. Furthermore, the contours and components of the Project purportedly identified in the FHWA's approval document have evolved and continue to evolve, making the Project an elusive target for review, let alone analysis of impact.

12.     Political expediency, *i.e.*, the financial imperative of Fluor-Transurban's private interests and the need for expeditious implementation of the Northern Section, has removed the Project, properly defined, from public scrutiny and legitimate, legally justifiable agency review and determination.  This political expediency and the abject failure of defendants to recognize that a private imperative cannot be a substitute for or a shield against their public duty and full disclosure of essential financial information underpin the arbitrary, capricious and invidious conduct of the defendants in their violation of law and unwillingness to undertake the necessary, comprehensive review of the environmental, public health, cultural and social impacts of the entire length and breadth of the Project.

13.     Upon information and belief, the defendants eschewed a well-reasoned analysis of whether the Northern Section would impact the environment because their goal was to avoid public scrutiny.  Such scrutiny would have revealed that the Project is designed in a manner that not only harms the environment but also causes disproportionate harm to minority and low-income communities.  Based on the defendants' deliberately inappropriate and artificially constrained traffic data and environmental analysis, including the absence of any analysis of the physical and health impacts on minority and low-income communities, and the deliberate failure to properly identify the Project, it is not possible, logical or reasonable to claim, as the defendants have done, that the Northern Section of the Project will not significantly impact the human environment or that the Project can be fully, properly and legally understood and analyzed without examining it in its entirety.

14.     The actions of FHWA, VDOT and the individual defendants violated federal environmental obligations governing the procedure and analysis to be used in evaluating applications for transportation projects.  In addition, their goals were antithetical to

the goals of the federal statutory framework, which is designed to maximize public disclosure and informed deliberation. Finally, their actions also constituted civil rights violations as they discriminated against minority and low-income communities.

15.     As more fully set out below, Arlington County seeks (i) a declaration that FHWA's January 9, 2009 "Categorical Exclusion" determination was arbitrary, capricious and contrary to law; (ii) a declaration that the defendants, including Secretary LaHood, Administrator Mendez and Secretary Homer, are in violation of Title VI of the Civil Rights Act and the 5th and 14th Amendments to the United States Constitution and, for Secretary Homer, also Article 1 § 11 of the Virginia Constitution; (iii) to enjoin defendants VDOT and Secretary Homer from entering into any further agreements or contracts with Fluor-Transurban; and (iv) to enjoin defendants, including Secretary LaHood, Secretary Homer and Administrator Mendez, in their individual capacities, from proceeding with the Project - Northern, Southern, or otherwise - until the defendants engage in a lawfully sufficient analysis of the Project's impacts and prepare a comprehensive and detailed Environmental Impact Statement pursuant to NEPA for the Project from Spotsylvania County to the Eads Street/Pentagon Reservation interchange in Arlington County, or, if appropriate, an environmental assessment ("EA") for the properly defined scope of the Northern Section.

## JURISDICTION AND VENUE

16.     Jurisdiction of this action is based on 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); 28 U.S.C. §§ 2201, 2202 (declaratory and further relief); 28 U.S.C. § 1343 (redress of civil rights); 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act); and 28 U.S.C. § 1367 (supplemental jurisdiction). Plaintiff claims that defendants have acted in an arbitrary and capricious manner and in violation of law.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(2) because this is an action against agencies of the United States.

## PARTIES

18.     Plaintiff County Board of Arlington, Virginia ("Arlington County") is the governing body of Arlington County, Virginia, a political subdivision of the Commonwealth of Virginia, which jurisdiction is traversed by FHWA's and VDOT's proposed Northern Section, whose residents will be adversely affected and whose legislatively-approved land use plans and long-range development goals will be compromised.

19.     Defendant United States Department of Transportation ("USDOT") is the executive department of the Federal government responsible for oversight of the transportation planning process pursuant to the Department of Transportation Act that resides in Washington, District of Columbia.

20.     Defendant Secretary Raymond H. LaHood is the United States Secretary of Transportation and the head of the United States Department of Transportation.  Secretary LaHood is being sued in his official and individual capacities.

21.     Defendant Federal Highway Administration ("FHWA") is an agency of the United States Department of Transportation that resides in Washington, District of Columbia.

22.     Defendant Federal Highway Administrator Victor Mendez is the head of the Federal Highway Administration.  Administrator Mendez is being sued in his official and individual capacities.

23.     Defendant Virginia Department of Transportation ("VDOT") is an agency created under the laws of the Commonwealth of Virginia.

24.     Defendant Secretary Pierce R. Homer is the Virginia Secretary of Transportation and the head of VDOT.  Secretary Homer is being sued in his official and individual capacities.

## SUMMARY OF LAW

NEPA

25.     The National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), requires FHWA and VDOT to consider the environmental impacts of any "major federal action significantly affecting the quality of the human environment." 42 U.S.C.§ 4332 (2)(C).  NEPA compliance is triggered by the Project in this case because, among other reasons, FHWA must approve any new points of access to or exits from the interstate highway system.  23 U.S.C. § 111(a).

26.     In addition, NEPA, Title VI of the Civil Rights Act and FHWA Orders require the FHWA and the VDOT to identify and consider disproportionately high and adverse health and environmental impacts on minority and low-income populations.

27.     Construction of the Project cannot proceed until, among other requirements, NEPA review is satisfied through (i) the issuance of a final Environmental Impact Statement ("EIS"); (ii) the issuance of a final Environmental Assessment ("EA") finding "no significant impact;" or (iii) a finding that the Project is categorically excluded from the class of action for which an EIS or EA is required.  40 C.F.R. § 1508.4.

28.     An EIS is a detailed written statement concerning the environmental and public health impacts of the proposed action and its alternatives, adverse environmental effects which cannot be avoided, the relationship between local short term use of the environment and the maintenance and enhancement of long term productivity and any irreversible and any

irretrievable commitments of resources. 42 U.S.C. § 4332(2)(C). Agencies must consider and disclose the environmental and public health impacts to the public so that the public and the decision-makers may be fully informed and may adequately determine and address the consequences of a proposed action.

29.    If it is uncertain whether the proposed action may have a significant effect on the environment, the agency must prepare an EA analyzing the effects of the action. 40 C.F.R.§ 1501.3. An EA is a public document that provides significant evidence and analysis to determine whether to prepare an EIS. The EA must include an analysis of alternatives of the action and sufficient analyses of the environmental and public health impacts of the action and its alternatives. 40 C.F.R. § 1508.9. The VDOT is currently preparing an EA for the so-called "Southern Section" of the proposed Project scheduled for public review in mid-2010.

30.    A Categorical Exclusion ("CE") may be authorized only for a very limited "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [its] regulations." 40 C.F.R. § 1508.4.

31.    Whether the impact of an action will be deemed significant and therefore ineligible for a Categorical Exclusion "requires considerations of both context and intensity." 40 C.F.R. § 1508.27. The significance of an action in context "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* A project's intensity is weighed with reference to the severity of its impact, *e.g.*, degree of impact on geography, public health or safety. *Id.* Intensity also considers "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* "Significance exists if it is reasonable to anticipate a

cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). Cumulative

actions are defined as "actions, which when viewed with other proposed actions have

cumulatively significant impacts." 40 C.F.R. §1508.7. This includes impacts resulting from

"individually minor but collectively significant actions taking place over a period of time." *Id.*

32.    The significance of an action cannot be avoided by "breaking it down into

small component parts." 40 C.F.R. § 1508.27. Rather, an agency must consider "connected"

or "cumulative" actions in a single unitary environmental review document. 40 C.F.R. §

1508.25(a)(1)-(2). This includes, but is not limited to, any series of interrelated steps

constituting an integrated plan or an activity that has an inextricable unity, whether physical or

financial, or cannot or will not proceed until other actions are taken previously or

simultaneously. *Id.*

33.    Subject to these universal principles, each federal agency may develop its

own criteria for determining the appropriate level of environmental review for different types

of actions that come within its purview. 40 C.F.R. § 1507.3(b)(2). FHWA has implemented

its own regulations describing the appropriate circumstances for application of each of the

three classes of environmental review. 23 C.F.R. § 771.115.

34.    Under FHWA's NEPA regulations, a categorical exclusion may be used

for actions that "do not involve significant environmental impacts" and do not induce

significant impacts to planned growth or land use for the area; do not require the relocation of

significant numbers of people; do not have a significant impact on any natural, cultural,

recreational, historic or other resource; do not involve significant air, noise, or water quality

impacts; do not have significant impacts on travel patterns; or do not otherwise, either

individually or cumulatively, have any significant environmental impacts. 23 C.F.R. § 771.117(a).

35.     The FHWA regulations specify two types of actions that satisfy these criteria and thus may be excluded from detailed environmental review.  23 C.F.R. § 711.115(b).

    (i)     The first type consists of a list of twenty actions that are deemed to meet the criteria for a Categorical Exclusion without any NEPA documentation. 23 C.F.R. § 771.117(c).  The Project does not fit within this list of twenty actions.

    (ii)    The second type is comprised of additional actions that may be deemed eligible for a Categorical Exclusion after further administrative review and approval.

36.     The second type of Categorical Exclusion is only intended for certain types of actions that satisfy the overarching criteria of a categorical exclusion set forth in 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a).  To obtain this type of Categorical Exclusion, the applicant must submit documentation demonstrating that its proposal complies with such criteria and that significant environmental effects will not result from the proposal.  23 C.F.R. § 771.117(d).  VDOT recommended, and the FHWA approved, this second type of Categorical Exclusion for the so-called "Northern Section" of the proposed Project.

## CLEAN AIR ACT

37.     The Clean Air Act prohibits any action or project that does not conform to the relevant state implementation plan ("SIP") for achieving the National Ambient Air Quality Standards ("NAAQS").  42 U.S.C. § 7506 (c)(1).  This "conformity" analysis must demonstrate that the Project will not "cause or contribute to any new violation of any standard

in any area; increase the frequency or severity of any existing violation of any standard in any area; or delay timely attainment of any standard or any required interim emission reductions or other milestones in any area." 42 U.S.C. § 7506 (c)(1)(B). If the Project does not conform to the SIP, it cannot be approved or allowed to proceed.

38.     The conformity rule requires air quality conformity determinations for transportation projects in non-attainment or maintenance areas for the criteria pollutants for which the area is designated non-attainment or maintenance. 40 C.F.R. § 93.102(b).

39.     The conformity rule sets forth requirements for determining conformity including that the transportation project not cause or contribute to any new "localized" -- hot spot -- CO and/or $PM_{2.5}$ violations. 40 C.F.R. §§ 93.116(a), 93.123.

FAHA

40.     The FAHA requires that before approving a transportation project, Federal agencies must consider alternative courses of action and make a decision in the "best overall interest" based in great part on the social, economic and environmental impacts of the proposed transportation project and on national, State and local environmental protection goals. 23 U.S.C. § 109(a), (h); 23 C.F.R. § 771.105.

41.     A Federal agency may not approve a transportation project unless it first makes the public interest determination and findings set out in 23 U.S.C. § 109(a) and (h), and 23 C.F.R. § 771.101, 105 and 107(b).

## PROJECT BACKGROUND – THE PRETENSE OF HIGH OCCUPANCY

42.     The HOV lanes were first created in Northern Virginia in 1969, along what is now the I-95/I-395 corridor. The southern terminus of the HOV lanes is currently the Town of Dumfries in Prince William County, while the northern terminus is at the approach to the 14th Street Bridge into the District of Columbia. The HOV lanes are separate, segregated

lanes that are restricted during the morning and evening rush hours to automobiles carrying multiple passengers (three or more), vans and buses. The purpose of the HOV lanes is to reduce traffic congestion and air pollution by encouraging carpooling, vanpooling and mass transit use along the I-95/I-395 corridor.

43. Running south from the northern terminus of the HOV lanes, Arlington County straddles the so-called Northern Section of the Project. For decades, Arlington County has followed a policy of encouraging high-density, mixed-use and transit-oriented development — also known as "smart growth." This type of development concentrates growth while combining residential and commercial buildings in the same area. The goals of "smart growth" include maximizing pedestrian, bicycle and mass transit access, and, in turn, reducing the adverse environmental, public health and public safety effects of heavy, single-occupancy automobile use. As the HOV facility arises out of similar policy goals, Arlington County and its residents have strongly supported, through practice and legislative mandate, the use and maintenance of the HOV lanes.

44. According to VDOT's High Occupancy Vehicle Enforcement Task Force ("Task Force") in 2005, the HOV system in Northern Virginia is one of the most successful in the country. It carries more peak-hour passengers than the general purpose lanes, bus systems, Metrorail or Virginia Railway Express. According to the Task Force, the I-95/I-395 HOV facility is the single most important element of the regional transportation network. The Task Force unequivocally stated that the viability of the entire Northern Virginia transportation network is directly linked to the continued success of the HOV lanes.

45. The environmental benefits of the I-95/I-395 HOV system are clear. They effectively and predictably manage congestion and, therefore, facilitate attainment of the

region's clean air goals. The I-395 HOV lanes accommodate nearly twice as many commuters in a third as many vehicles over the adjacent conventional lanes. Upon information and belief, the Project will contribute to a degradation of the hugely successful HOV facility.

46.     The regional bus services rely on dependable HOV lanes as do thousands of commuters in Arlington and surrounding communities who take advantage of the enormously successful phenomenon of "slugging." "Slugging," (dynamic ride sharing or instant carpooling) refers to drivers who pick up passengers at formally and informally designated locations, both in morning and evening peak-hour periods, in order to travel legally in the HOV lanes. A "slug" is an individual who accepts a ride. The "slugging" system helps to ensure that the largest number of people will utilize the HOV lanes in the smallest number of cars.

47.     In 2006, VDOT, Fluor and Transurban proposed the Project to alter and expand a fifty-six-mile stretch of the I-95/I-395 corridor, which traverses five Northern Virginia counties (Arlington, Fairfax, Prince William, Stafford and Spotsylvania), as well as the City of Alexandria, Virginia. A key component of the proposal – the *raison d'etre* for the Fluor-Transurban involvement -- is the alteration of the current HOV lanes into a shared HOV/HOT facility with collection of the tolls for Fluor-Transurban's benefit for the next eighty (80) years.

48.     On October 4, 2006, pursuant to the PPTA, VDOT and Fluor-Transurban entered into a preliminary Project agreement titled "Interim Agreement To Develop And/Or Operate The I-95/395 HOT Lanes Project In Virginia" (the "Interim Agreement"). The Interim Agreement contemplates that the current HOV lanes on the corridor will be transformed into HOV/HOT lanes, and that these HOV/HOT lanes will be further extended southward through

Spotsylvania County.  The difference between the two types of lanes is that while access to

HOV lanes is restricted to multi-passenger and transit vehicles, HOT lanes are also open to

single-passenger vehicles who pay a toll.  VDOT would own and oversee the HOT lanes from

a distance, while Fluor-Transurban would build and operate them and collect the tolls for their

benefit.

        49.     In submitting the proposed Project, in its narrowly defined form, to

FHWA, VDOT recommended that the Project be subdivided into two separate undertakings for

NEPA environmental analysis purposes, and FHWA approved this recommendation.

Specifically, the conversion of the existing HOV lanes into HOT lanes (the "Northern

Section") and the extension of these HOT lanes into Spotsylvania County (the "Southern

Section") were deemed to be two entirely separate projects.  Although its contours and precise

phasing are still in flux, the 36-mile Northern Section also includes the construction of a new

eight-mile travel lane, as well as modified and new access and exit points along the entire

corridor, and construction of flyover ramps, pedestrian bridges, parking lots and bus transfer

stations.  Recently, VDOT acknowledged the need for additional, significant scoping reviews

for the Eads Street/Pentagon, Shirlington Rotary and Seminary Road interchanges that will

require more time and analysis and likely result in a supplement to the Categorical Exclusion

documentation.  Defendants artificially defined the Northern Section, thereby delaying true

scrutiny as required by NEPA until after the Categorical Exclusion determination, and now

attempt to rectify their legal deficiencies.  Defendants were wholly and deliberately

irresponsible in recommending and adopting a Categorical Exclusion for the Northern Section.

        50.     VDOT further requested that the so-called "Northern Section" be deemed

a "Categorical Exclusion" for purposes of NEPA environmental review, on the theory that it

was so clearly unlikely to result in a significant environmental impact that even an Environmental Assessment detailing the absence of such an impact was unnecessary. On August 31, 2006, FHWA approved, with conditions, VDOT's recommendation for the Northern Section. In so doing, FHWA and VDOT failed to base their approval on any serious, or even cursory, traffic and environmental analyses sufficient to show that the Project would not (i) result in significant impacts to the human or natural environment; (ii) significantly impact travel patterns; or (iii) affect the roadway network at either terminus forcing additional improvements beyond the scope of the Project.

51.     On January 7, 2009, at the recommendation of VDOT and purportedly in accordance with 23 C.F.R. § 771.117(d), FHWA approved the final Categorical Exclusion status for the Project. *See* Documentation of FHWA Review, I-95/I-395 HOV/Bus/HOT Lanes Project, 0095-96A-107, PE101; UPC #70849 ("Documentation of Review"), attached hereto as **Exhibit A**. FHWA based its approval on documentation submitted by VDOT that purportedly demonstrated that the specific Categorical Exclusion criteria were satisfied, that significant environmental effects would not result, and that FHWA's conditions to its earlier, preliminary approval had been satisfied even though that documentation was woefully inadequate and misleading on its face.

52.     The Documentation of Review sets out the following supporting data and analyses: (i) Noise Analysis Technical Report, December 2008; (ii) Air Quality Analysis Technical Report, November 2008; (iii) Joint Permit Application, October 2008; (iv) Draft Interchange Justification Report, October 2008; (v) Existing Conditions Report, March 2008; and (vi) Section 4(f) Application Analysis, December 2007.

53.     In its Documentation of Review, FHWA explained the basis for its final approval of the Project's Categorical Exclusion status.  Specifically, FHWA stated:  (i) there would only be marginal increases in mobile source air toxics ("MSAT") pollutants as a result of the Northern Section; (ii) the Project would not cause or contribute to any new localized fine particulate matter ("$PM_{2.5}$") violations or increase the frequency or severity of any existing violations or delay timely attainment of the National Ambient Air Quality Standards ("NAAQS") for $PM_{2.5}$; (iii) one- and eight-hour carbon monoxide ("CO") concentrations resulting from the Northern Section would be well below the NAAQS for CO; and (iv) the Northern Section satisfied transportation air quality conformity requirements.

54.     Furthermore, FHWA stated that greenhouse gas ("GHG") emissions, as they impact climate change, did not need to be evaluated because climate change is more appropriately addressed for transportation systems at the regional level.  The FHWA further stated that "any change to greenhouse gas levels as a result of the project are *likely* to be insignificant." [Emphasis added].  There is no documentation to support such conclusion.

55.     FHWA concluded that significant environmental effects would not result, finding specifically that the Project would not (i) induce significant impacts to planned growth or land use for the area; (ii) result in significant air impacts; (iii) have significant impacts on travel patterns; or (iv) otherwise have, either individually or cumulatively, any significant environmental impacts.

56.     FHWA's approval of the Categorical Exclusion and the process that led to that approval were inadequate for numerous reasons, including, but not limited to the following: (i) VDOT's submission of the Project to FHWA misstated and, in fact, excluded essential facts and lacked any basis for segmenting the Project into a "Northern Section" and a

"Southern Section" for environmental analysis purposes; (ii) defendants failed to adequately calculate pollutants emissions as a result of the Project to determine whether local and regional air quality standards were satisfied; and (iii) defendants deliberately restricted their analysis of the impacts of the Project on public health, ignoring completely impacts on vulnerable populations and on minority and/or low-income communities.

### PROJECT IN FACT – FALSE SUBMISSION AND IMPROPER SEGMENTATION

57.     The Interim Agreement between VDOT and Fluor-Transurban describes the Project as the addition of up to three (3) HOT lanes on I-95/I-395, beginning south of the U.S. Route 17 By-Pass at Massaponox, Spotsylvania County and continuing north to south of the 14th Street Bridge in Arlington County.  Similarly, in its May 2009 Project Summary and July 16, 2009 presentation to the Commonwealth Transportation Board, the VDOT identified the Project as beginning in Massaponox, Spotsylvania County and extending north fifty-six miles to the Eads Street/Pentagon Reservation interchange in Arlington. For purposes of NEPA, however, FHWA and VDOT have segmented the Project into the Northern Section and the Southern Section and presented tem as separate projects.  The FHWA approved Categorical Exclusion status for the Northern Section; the Southern Section is undergoing an Environmental Assessment.  In practical, operational, financial and philosophical terms, the Northern Section and the Southern Section are interdependent and inextricably linked.  Upon information and belief, the Southern Section is vital in the economic viability of the entire Project and cannot be evaluated separately for the Northern Section.

58.     The actual scope of the Project, including the Northern Section, is greater than what was first presented to FHWA in 2006; the Project changed before the FHWA's January 2009 Categorical Exclusion determination, and is still evolving.  The Project's current elements are as follows:

(i)     expansion of the HOV facility from 2 to 3 lanes and construction of approximately twenty-eight miles of new highway lanes;

(ii)     construction of six (6) new parking lots accommodating at least 3,000 (possibly as many as 6,000) vehicles, all located in low-income, minority areas, with three (3) planned in the Northern Section and three (3) planned in the Southern Section;

(iii)     construction of at least twelve (12) bus station expansions, improvements and related roadway alterations, including locations in both the Northern Section and the Southern Section;

(iv)     construction of a new pedestrian bridge across I-95 as part of the Lorton, Fairfax County bus station construction;

(v)     construction of thirteen (13) to twenty-two (22) new or expanded access points along the I-95/I-395 corridor;

(vi)     construction of a new reversible lane bus ramp at Seminary Road;

(vii)     construction of a new access flyover, including a 1.5 mile ramp for HOT lane users directly into the Aquia Creek/Harbor residential development;

(viii)     the replacement of existing sound walls and addition of new sound walls along the entire length of the I-95/I-395 corridor in the Project; and

(ix)     modifications to the Bus Rapid Transit ("BRT") operations and facilities.  In addition, as part of VDOT's Springfield interchange expansion project in Fairfax County (intersection of I-95, I-395 and I-

495), there are to be seven bridges built into the Springfield interchange to accommodate traffic to and from the I-95/I-395 "HOT" lanes.

59.     The components of the Project cannot be fully accommodated within the existing variable 300-800 foot state-owned right-of-way.  The direct, flyover and slip ramps required for the new and expanded access points and requisite storm water management areas warrant the acquisition of additional right-of-way for the Project.  A modified pedestrian bridge over the Shirlington Rotary to accommodate universal access, not included in any analysis, will also require additional right-of-way and cause disruption to adjacent communities.  The proposed parking lots and new or expanded access points and the requisite additional right-of-way will adversely impact communities located in census tracts that are predominately minority or minority/below poverty income level.

60.     Vollmer Associates, LLP, a consultant to the Project, advised that the I-95/I-395 HOT lanes facility should be considered and evaluated in its entirety in the context of the overall HOV/HOT lanes network in Northern Virginia, *i.e.*, including the Southern Section and the I-495 (Capital Beltway) projects.  Moreover, in light of defendant's stated goal to develop a regional and reliable transportation facility, it would be irrational and, at a minimum unwise, to undertake the Northern Section if the Southern Section were not completed.  Yet, that remains a distinct possibility as defendants have approved the Northern Section before even finishing preliminary review on the Southern Section.

61.     VDOT made a deliberate decision not to provide the full definition of the Project in its submissions to FHWA.  Furthermore, VDOT continues to modify certain component designs such as those for the Shirlington Rotary and the Seminary Road interchanges.  Thus, even if, assuming *arguendo*, the Categorical Exclusion determination was

23

proper when issued, the Project no longer resembles that which was approved.  Defendants'

willful disregard of that fact is further evidence of their arbitrary and capricious conduct in

derogation of duty.

62.     All of the impacted local jurisdictions either have opposed the Northern

Section due to the limited review and analysis or withheld support and identified substantive

traffic, environmental and social community issues related to the Project as now understood.

FHWA and VDOT have not addressed such concerns.

## SOCIO-ECONOMIC HAVES AND HAVE NOTS
## A NEW PROTECTED CLASS

63.     The Project has created a new protected class -- the largely white, exurban

single occupancy rider of sufficient wealth to be able to afford the payment of significant tolls

to use the I-95/I-395 corridor.  In his May 7, 2009 letter to regional planning and transportation

organizations, Secretary Homer laid bare the pretense of this Project as a high occupancy

facility.  "The HOT lanes project is part of an emerging network of managed lanes that will

serve the major public and private job centers in the region. The combined project will enable a

reliable single-seat ride in a managed facility from Garrisonville to Tysons Corner or to the

Pentagon. Neither is possible today."

64.     In support of this class and its unique desire for the privileged HOT lanes,

the defendants, including Secretary LaHood, Administrator Mendez, and Secretary Homer,

deliberately and knowingly decided (i) to expend public funds; (ii) to ignore their obligations,

procedural and substantive, under NEPA, the CEQ regulations, Title VI of the Civil Rights

Act, the FAHA, FHWA's Orders and national precedents in other communities governing its

duty in matters of race and poverty, and of Article 1, § 11 of the Virginia Constitution and the

5th and 14th Amendments to the United States Constitution; (iii) to propose to dramatically alter

the I-95/I-395 corridor, a regional transportation facility through five Northern Virginia counties and the City of Alexandria, that encompasses approximately forty (40) census tracts that are predominately minority or minority/below the poverty income level; (iv) to degrade the air quality and unnecessarily place at risk the health of Arlington County's residents, particularly minorities, poor, elderly and working-class people and families living, working, and going to schools, day care centers and health care facilities proximate to the Project and within its study area; and (v) to risk the safety and health of those working-class, civil servant, minority and low-income people whose commutes to and from work, day care, school and hospitals using the HOV lanes will be restricted or curtailed.  In seeking to fulfill its goal, VDOT and Secretary Homer, acting under color of law and with the acquiescence and support of the FHWA and Fluor-Transurban, have impacted the minority families of Arlington County specially, harmfully, insidiously and disparately in order to provide HOT lanes for the benefit of defendants new, protected, single-seat rider class.

65.     Arlington County is a community that has methodically followed a policy of (i) increasing transit and transit usage and (ii) encouraging true HOV usage and the "slugging" system of commuters gathering in designated locations to use the HOV lanes -- all deliberate and coordinated, and ultimately successful efforts to decrease air pollution and related public health and public safety risks.  In this context, the conversion of HOV lanes into HOT lanes by the defendants reflects a deliberate decision to dismiss Arlington County's long-held, legislatively-approved programs and policy goals and instead support continued suburbanization and sprawl.  Most of the current users of the existing public transit, HOV lanes and slugger systems believe, and documentation so supports, that the Project will disrupt the current facility and transportation system and discourage drivers from using HOV lanes and

picking up sluggers.  This outcome is totally antithetical to the choices these people and their local government have made.  FHWA and VDOT are informed fully that most of these people will not use the proposed HOT lanes.

66.     The deliberate, disparate and discriminatory nature of this publicly-supported Project is clearly illustrated by the distinct racial and income demographics of the Northern Section and the Southern Section.  I-95 and I-395 are publicly funded highways.  FHWA's and VDOT's deliberate discrimination is not merely directed against those who cannot afford this privilege but is also directed against those in Arlington County and adjacent jurisdictions who must pay a cost in terms of their health and quality of life.  Forty census tracts of minority and low-income families and individuals are located along the I-95/I-395 corridor within the study area of the Project.  In Arlington County, there are also enclaves of other populations of concern – schools, day care centers, senior citizen facilities, hospitals and clinics - that are in close proximity to the Project or are within the Project's study area.

67.     In Arlington County, there are three (3) elementary schools that are vulnerable to the adverse impacts of the Project – Hoffman-Boston Elementary and Oakridge Elementary are both in designated minority/below poverty income level family residential areas; and Abingdon Elementary also is located in the study area and with a predominately minority population.  Also, proximate to Abingdon Elementary are the proposed new and expanded access points for the Shirlington Rotary interchange and two (2) of the proposed Project parking lots.

68.     Within the study area and proximate to the Eads Street/Pentagon Reservation terminus of the Project are centers of populations that are particularly vulnerable to reduced air quality -- the Arlington Urgent Care Center, Crystal City Children's Center and

the Child Care Center. Each facility cares daily for a vulnerable population, the racial composition of which fluctuates over time.

69.     The Northern Section of the Project impacts the counties of Arlington, Fairfax, Prince William, the City of Alexandria and the northern area of Stafford County. With respect to Arlington County, the local jurisdiction most impacted by the deficiencies in local roadway and air quality impacts analyses, the demographics inform the conclusion of inherent inequity in the implementation and operation of the Project. (The City of Alexandria, also near the northern terminus of the Project, is similarly impacted.)

70.     Arlington County is 40% minority, with 7.8% of residents below the poverty line. It has four (4) census tracts of families that are predominately minority and/or below the poverty level along the I-395 corridor. In fact, throughout the Northern Section of the I-95/395 corridor, as defined for purposes of this Project, there are numerous census tracts that are predominately minority and/or minority below the poverty line -- an overwhelming majority of the people and families residing along the I-95/395 corridor within the Northern Section area, with the schools, day care centers and health care facilities that serve this same population, independent of pockets of similarly-conditioned families outside of the designated census tracts but within the scope of the corridor.

71.     Arlington County has a population density of 8,112 people per square mile and a housing density of 3,495 housing units per square mile.

72.     By contrast, the Southern Section traverses most of Stafford County and Spotsylvania County, with only 21% and 19% minority populations, respectively. Between 2.4% of families and 4.2% of individuals in Stafford County are below the poverty level; 4.7% of the residents of Spotsylvania County live below the poverty line. Stafford County has two

census tracts of minority and/or below the poverty income level populations, both located adjacent to I-95.  Spotsylvania has no census tract along I-95 that is predominately minority or poor.

73.     Growth rates in Spotsylvania and Stafford counties have been astronomical:  between 1990 and 2000, Stafford County increased in population by 50%; Spotsylvania County by 57.5%.  Both counties are largely suburban and rural in character. They are characterized by the "subdivision" -- an exclusive single-use, residential zoning classification which, as a practical, architectural and historical matter, is automobile dependent and oriented. They continue to epitomize a culture of a different era and a particular way of living.  With minor exceptions and by deliberate local jurisdiction and VDOT choice, both counties largely lack conventional street grids or transit systems.  Among Spotsylvania County's commuters, 52.5% to 64% of all commuters work outside the county and 79% of all county commuters drive to work alone.  In Stafford County, 55.9% of all commuters work outside the county.  Almost all commuters travel north in the morning rush period and return south in the evening.  It is clear whom the Project benefits and which culture and lifestyle are furthered by the HOT lanes.

74.     Stafford County has a population density of only 342 people per square mile and a housing density of 83 units per square mile.  Spotsylvania County has a population density of 226 people per square mile and a housing density of 83 units per square mile.

75.     The growth experienced by these two Southern Section counties is a direct result of the policy choices they have made in zoning (single-use zoning), forms of roadway construction (the curvilinear street), housing patterns (primarily single family subdivision) and transit (the absence thereof), along with other social trends such as white flight from core urban

areas and cultural mores rejecting the value of the urban grid and closely knit, mixed-use neighborhoods. These choices, and local government and VDOT decisions to support if not encourage these choices and characteristics, have imposed significant environmental consequences upon the residents and government of Arlington County especially its minority and low income families who reside within the I-395 corridor study area – consequences that would now be exacerbated as a result of the implementation of the Northern Section.

76. The plan to create new HOT lanes for single-seat riders is designed to permit unabated growth in Stafford County and Spotsylvania County, without regard to the externalities that others will suffer as a result. Specifically, HOT lanes will encourage, open and support new frontiers for real estate development and increase the pressures on land use patterns, particularly in the region along the Southern Section, that also will have discernible and egregious impacts on Arlington County. The Project will validate and encourage an exponential increase in environmentally harmful, vehicle-dependent development and growth patterns already prevalent in Prince William, Stafford and Spotsylvania counties and areas further south along the I-95 corridor. Defendants deliberately excluded from any analysis the impacts on land use -- sprawl -- on the Southern Section and its corresponding, inescapable and inexorable effect on traffic volumes on the Northern Section.

77. Defendants' imperative for a reliable, regional "single-seat ride" will only increase the size and demands of the new, protected class and exacerbate disparate impacts on minority and low-income populations along the corridor, in particular in Arlington County.

78. A study by Environmental Defense and Breakthrough Technologies, dated September 21, 2005, recognized the likelihood of sprawl and increased air pollution as a result of the Project. According to the study, HOT lanes could exacerbate sprawl development, boost

dependence on costly foreign oil and counter progress in addressing the region's continuing serious air quality problems. The study further projects a likely increase of traffic congestion on the local roads throughout the corridor, in areas in which there are predominately minority and low-income populations.

79.     The acknowledged sprawl, local road congestion and commuting choices by residents in Prince William, Stafford and Spotsylvania counties belie any purported neutrality or ignorance on the part of FHWA and VDOT of the Project's impacts with respect to race and income. These agencies and Fluor-Transurban participated in the Environmental Defense study's formulation and provided substantive comments. FHWA's and VDOT's knowledge of its content and conclusions now precludes them from asserting that the Project, and the harm it likely will cause, are anything other than deliberate actions on their part.

## TRAFFIC ANALYSIS - DATA ON THE MOVE

80.     The January 2009 "Documentation of FHWA Review" relies on VDOT's Interchange Justification Report ("IJR") for (i) analyses of traffic capacity and congestion along the I-95/I-395 corridor, (ii) traffic flow and delays at entry/exit points between the general purpose travel lanes (*i.e.*, non-HOV lanes) and the proposed HOV/HOT lanes facility, and (iii) comparison of the "No-Build" and "Build" alternatives. The IJR purports to support a goal of the Project to expand and enhance the existing I-95/I-395 corridor to relieve congestion and reduce travel delays to meet future transportation demand of the general purpose lanes along the corridor.

81.     VDOT deliberately has not released pertinent Project information to local stakeholders, preferring to shield such information from public scrutiny based on commercial proprietary status.

82.     The IJR's comparison of the "Build" and "No-Build" alternatives incorrectly assumes that if the "Build" alternative, *i.e.*, the Project, is not implemented, then the current capacity of the facility and its characteristics will remain unchanged through the 2030 design year.  This approach contradicts standard practice for major transportation projects by ignoring comparison of the "Build" scenario with several viable alternatives, including simple modification to existing conditions, to determine the best operations for the driving public at the most favorable cost, *i.e.*, the best overall public interest.  In light of current modeling methodology, it is simple in the extreme, and irresponsible, to limit an alternative analysis to merely the "Build" and "No Build."  Despite its acknowledgement of the need for an alternative analysis generally, the IJR also dismisses the lack of alternatives analysis as being unnecessary for projects that qualify for a Categorical Exclusion.  This is another example of the defendants skewing the process to improperly invoke the Categorical Exclusion to avoid generally accepted engineering practices, *i.e.*, conducting a proper alternative analysis for a transportation project of this magnitude, and refusing to conduct such accepted practices because the Northern Section was deemed a Categorical Exclusion.

83.     Furthermore, even taken at face value, the IJR makes numerous un-supported conclusion in favor of the "Build" alternative.  For example, improvements at only one intersection (Shirlington Rotary and Shirlington Road) in the "No-Build" alternative would result in less total vehicle delay for all intersections on the Shirlington Rotary than that provided by the "Build" alternative, *i.e.*, defendants' Project.  The "Build" alternative also increases the total number of vehicle stops at the six intersections on the Shirlington Rotary by over 7000 stops, approximately 200% more than the "No-Build" alternative.  The single modification to the "No-Build" alternative would result in less delay and fewer stops (and

therefore lower emissions and fuel consumption) at the Shirlington Rotary intersections than defendants' preferred "Build" alternative.

84.    Upon information and belief defendants' traffic modeling also is flawed, unreliable and not consistent with generally accepted engineering practices for a transportation project. Defendants failed to apply the most basic procedure for ensuring traffic projection accuracy by not calibrating the travel demand model prior to projecting traffic data – data on which proper calculations of air emissions are based. Flawed data provide deficient air emissions analyses and misjudgments on public health impacts. The IJR's unreliability extends to the modeling procedure applied to Project intersections with the improper effect of significantly overstating the approach delays at the Shirlington Rotary for the "No-Build" alternative.

85.    Traffic modeling and data for the Northern Section are used merely to achieve a favorable result and are woefully inadequate to support a credible environmental analysis. The deficiencies include: (i) a traffic model that was not properly calibrated and modeling procedures that deviated from standard and generally accepted engineering practices; (ii) modeling assumptions that were not validated with Arlington County traffic engineers and those of other local jurisdictions most impacted by the Project; (iii) no analysis of the impacts of the Northern Section on Arlington's local street network, the mitigation of which will be borne solely by Arlington; (iv) an analysis that under-predicts the impacts at the north terminus of the Project -- Eads Street/ Pentagon Reservation interchange -- of a third HOV lane with additional traffic volume merging when the HOV facility narrows to two lanes at the 14th Street Bridge; (v) no analysis of the impacts on Arlington's local street network during security alerts at the Pentagon Reservation; (vi) no analysis of traffic delays and queues (and therefore

lack of data for air emissions calculations) as a result of vehicle breakdowns or accidents in the HOV/HOT lanes – particularly relevant due to the elimination of safe-width shoulder lanes along most of the Northern Section; and (vii) no analysis of the impact of the Northern Section on traffic delays and levels of service (and therefore lack of data for air emissions calculations) on both general purpose lanes and HOV/HOT lanes at the southern terminus until the Southern Section is implemented.

86.    Due to the flawed methodology and deceptive analysis, the IJR understates traffic volume and neglects impacts on adjacent and nearby local roads and intersections.  There will be increased congestion on local roadways and decreased levels of service at these intersections that will adversely impact the fabric and nature of the historic communities such as Shirlington, Fairlington and Parkfairfax adjacent to and nearby the Northern Section.

87.    The IJR's comparative analysis of positive and negative impacts of the Project is flawed because it suggests that a positive impact on the volume to capacity ratio (V/C) at one location offsets a negative impact elsewhere.  Because of the nature of traffic flow, the throughput of the general purpose lanes decreases dramatically once capacity is reached.  This will increase traffic delays and vehicle queues resulting in elevated pollutants emission levels (that increase at a much greater rate than the volume levels increase).  The IJR reveals that the worst section of the general purpose lanes studied (northbound north of Garrisonville Road in the AM peak), which already exceeds capacity, is further worsened in the "Build" alternative.  The IJR then relies on the construction of the Southern Section to remedy this situation, which is further evidence of defendants' deliberate deception in segmenting the Project.  The fact that the Project offers no improvement (and, in fact,

exacerbates a failing condition) to this general purpose lane congestion is inconsistent with good engineering practice and proper analysis would reveal a significant increase in pollutants emissions.

88.     The nature of the design and implementation, *i.e.*, design-build approach, of the Project is such that its components have been and continue to be modified, at times significantly, throughout the review and evaluation process.  In fact, VDOT's July 16, 2009 presentation before the Commonwealth Transportation Board Workshop identifies extensive scope reviews on the Northern Section due to construction costs, revenue forecast and the current financial market.  These scope reviews could significantly impact the current designs for the Shirlington Rotary, the Seminary Road interchange and other roadway segments, interchanges and local intersections not fully evaluated.  The scoping review also will include consideration of phasing options for the Northern Section exacerbating further the improper segmentation of the Project.  The additional scoping review alone supports the conclusion that defendants acted rashly and prematurely in determining that the Northern Section would not significantly impact the human environment.

89.     In selecting the Categorical Exclusion status, defendants explicitly commit the Project to having no significant impact on travel patterns.  It is axiomatic that the Project cannot simultaneously relieve traffic congestion, facilitate the construction of a new HOV lane and significant extension of existing HOV lanes, construct ancillary transit system infrastructure and be an integral component of a regional system to "enable a reliable single seat ride in a managed facility from Garrisonville to Tysons Corner or to the Pentagon," and yet have no significant impact on travel patterns.

## ENVIRONMENTAL AND PUBLIC HEALTH RISKS - OPAQUE ANALYSES

90.     Air quality analyses requirements are addressed both by NEPA and the Transportation Conformity Rule of the Clean Air Act.  Before defendants recommended and adopted the Categorical Exclusion, they had a responsibility to identify the Northern Section impacts on air quality and to ensure that the Northern Section conformed to the Virginia and regional air quality implementation plans.  To satisfy conformity requirements, the Northern Section must not cause or contribute to any new violations of any air quality standard, increase the frequency or severity of any existing violation of such standard or delay timely attainment of any air quality standard.  The IJR and the Air Quality Analysis do not provide the data and analyses to comply with NEPA and to determine whether the conformity requirements are satisfied.

91.     The Air Quality Analysis that supports the FHWA's Categorical Exclusion determination identifies its scope of review as encompassing the approximately thirty-six miles of the I-95/I-395 corridor from the Garrisonville Road interchange in Stafford County to the Eads Street/Pentagon Reservation interchange in Arlington County, *i.e.*, the Northern Section.  The Southern Section is currently undergoing a comprehensive environmental analysis.  The Air Quality Analysis further identifies that the Northern Section lies within a moderate 8-hour ozone and $PM_{2.5}$ nonattainment area.  Portions of the Northern Section, *i.e.*, within the City of Alexandria and Arlington County, are in a CO maintenance area.

92.     Defendants present the Air Quality Analysis as the basis for the FHWA's determination that the Northern Section, with its roadway changes, new and modified access

and exit ramps and flyovers, parking lots and bus stations, does not significantly affect the environment.

93.     However, as presented in the Air Quality Analysis, the operation of the Northern Section will increase (i) vehicle miles traveled; (ii) peak hour traffic volumes; and (iii) emissions of Mobile Source Air Toxic ("MSAT") pollutants.  Strongly-correlated indicators suggest that the Project also will increase emissions of carbon monoxide ("CO"), nitrogen oxide ("$NO_x$"), volatile organic compounds ("VOCs"), $PM_{2.5}$ and greenhouse gases ("GHG").  If the defendants' congestion mitigation prediction for the Project were accurate, air emissions for the Project would decrease from the "No-Build" alternative.  The prediction is not accurate and, therefore, emissions do not decrease with the "Build" alternative but likely will *increase*.

94.     Exposure to air toxic pollutants increases the risks of cancer and other serious human health effects.  As much as half of all cancers arising from exposure to outdoor sources of air toxic pollutants derive from the emissions of mobile sources -- cars, buses and trucks.  Since MSATs are known to cause cancer and other serious health effects, people who live or work near major roads are likely to experience greater exposures and higher health risks, particularly among the vulnerable populations.  Additionally, ambient exposure to air toxic pollutants can have long-term effects to ecological systems through uptake by plants and ingestion by animals.  Reductions of MSATs will annually prevent premature mortality for a significant number of people.  The United States Environmental Protection Agency ("EPA") identified these human health risks in recently initiating its regulatory program to control and reduce MSAT emissions.

95.     $PM_{2.5}$ is classified as both an MSAT and a criteria pollutant.  It poses a significant risk to human health because it easily penetrates the human respiratory system's defenses.  The Air Quality Analysis sets out the relationship between $PM_{2.5}$ pollution exposure and a variety of health issues such as:  (i) increased respiratory symptoms and difficulty of breathing; (ii) decreased lung function; (iii) aggravated asthma; (iv) chronic bronchitis; (v) irregular heartbeat; and (vi) nonfatal heart attacks.  Furthermore, scientific studies have associated exposure to $PM_{2.5}$ pollution with overall increased morbidity, mortality and exacerbation of existing cardio-vascular and respiratory conditions, particularly in vulnerable populations.  Studies have also shown that a reduction in exposure to $PM_{2.5}$ contributed to significant and measurable improvements in life expectancy.  The background levels of $PM_{2.5}$ in the metropolitan Washington, DC region provide little leeway for additional $PM_{2.5}$ emissions from the operation of the Northern Section.  The Project must demonstrate conformity with both regional and local requirements to attain and maintain the $PM_{2.5}$ standards.  Defendants' Air Quality Analysis does not make this demonstration.

96.     For conformity purposes, the Project is deemed "regionally significant," requiring $PM_{2.5}$ and CO emissions analyses.  The Northern Section alone is also "regionally significant."  On a local-scale, the Project is considered a project of air quality concern because of its potential to create localized ("hot spots") violations of $PM_{2.5}$ air quality standards.  The Project warrants then localized analyses to determine if it conforms to requirements under the Clean Air Act to not:  (i) cause or contribute to any new violation of any standard in any area; (ii) increase the frequency or severity of any existing violation of any standard in any area; or (iii) delay timely attainment of any standard in any area.  42 U.S.C. § 7506(c)(1)(B); 40 C.F.R. §§ 93.109, 93.116 and 93.123.

97.     For $PM_{2.5}$, the conformity regulations require consideration of local

impacts.  The Air Quality Analysis incorrectly relies only on a regional air monitor in

Muirkirk, Maryland as a surrogate monitor to fully satisfy the conformity analysis.  The area of

the surrogate monitor and the Project area should be comparable in terms of (i) traffic volumes

and percentages of diesel fuel emissions; (ii) distance between the monitor and the roadway

source of pollutants; (iii) land use and surrounding terrain; and (iv) prevailing wind direction.

However, there are significant distinctions between the Muirkirk monitor and the Project

rendering the Muirkirk monitor an inappropriate surrogate.  The Muirkirk monitor is over 1.5

miles from the nearest large roadway and the area surrounding it is largely rural.  These land

use characteristics are at extreme variance with the most heavily-impacted areas along the

Northern Section where homes, schools, and hospitals lie within 200 to 500 feet of the Project,

and land use is primarily of urban density, consisting mostly of low-income, minority

communities with specific impacted locations with vulnerable populations.  It is physically

impossible for the Muirkirk monitor to provide the data with which to evaluate whether the

Project causes or contributes to localized pollutant violations at these close-in locations.

98.     Increases in traffic volumes, such as those likely associated with the

Project, can lead to traffic congestion.  Long vehicle queues, typical of congestion, occur along

roadway segments, interchanges and intersections where levels of service are poor.  Air quality

impacts are more severe as traffic congestion worsens and vehicle queues lengthen.  The

Project's increases in vehicle volumes and vehicle miles travelled contradict the *regional* goal

of improvement in air quality through the concomitant Project-wide increase in emissions.

Increased traffic congestion caused by the Project along roadway segments and interchanges

and at nearby intersections also will result in decreased "levels of service" at many locations,

locally increasing pollutants and exacerbating air quality.  To ensure that air standards are not violated locally, transportation conformity requires that the Project apply hot-spot procedures to intersections where levels of service are poor due to increased traffic volumes caused by the Project.  40 C.F.R. § 93.123(a)(1)(ii).  The Air Quality Analysis that supports FHWA's Categorical Exclusion determination fails to analyze the Project's potential  to violate air quality standards  in these adjacent and nearby areas, many of which are low-income, minority communities.

99.     For air toxic pollutants, including $PM_{2.5}$, the Air Quality Analysis relies on the overly broad, average measure of the Project's increase in total vehicle miles travelled to characterize the potential health and environmental effects at all locations and time periods at which the population will be exposed.  It does not predict pollutant concentrations at specific locations or evaluate the number of people exposed to the Project's emissions.  Both of these factors are necessary, however, to determine the full environmental and public health impacts of the Northern Section on affected local communities, many of which are minority and low-income populations.

100.    The Air Quality Analysis shows an increase in toxic air emissions based on the projected increases in vehicle miles traveled as a result of just the Northern Section of the Project.  Any increase in air toxic emissions in the Project area will reduce anticipated gains in air quality from recently promulgated federal standards for the control of hazardous air pollutants from motor vehicles and motor vehicle fuels.  The Project will cause an *increase* in toxic air emissions, and this increase will impact the public health, particularly for affected vulnerable populations and low-income, minority communities at the many close-in locations of greater concentrations and exposure.

101.    Actual increases in toxic emissions concentrations caused by the Project will be very uneven among specific locations and at specific times along the Northern Section. The Air Quality Analysis identifies increases in traffic volumes during peak hours of up to 14% along certain roadway segments and 7% at certain interchanges, compared to the no-build alternative.  The IJR also shows that these increased volumes lead to a *decrease* in levels of service as a result of the Northern Section in many areas; in some cases from already-low levels of service to even more congested and poorer levels of services.  Such significant increases in traffic volumes and decreases in levels of service will cause greater emissions and significant increases in toxic concentrations, and greater duration of exposure to such concentrations for the communities adjacent to and nearby these intersections and segments, many of which are in low-income, minority communities.  Yet, the defendants apply an average measure of increase of MSATs along the full length of the Northern Section within the Air Quality Analysis, allowing no evaluation of localized emissions, concentrations and population exposed.

102.    Heavily populated residential areas line the length of the Northern Section. Many of these residential areas are low-income, minority communities.  In addition to residences, schools and other locations of vulnerable populations are also adjacent or within close proximity to the Project.  For example, the Hoffman-Boston Elementary School in Arlington County, with a majority minority population, is located only about 300 feet from the western edge of I-395, and just south of the Washington Boulevard interchange of the Project, where peak hour volumes are forecast to increase by about 5% to 7% over no-build conditions. Not only is Hoffman-Boston immediately adjacent to the Northern Section, it is also located at a point that is in a direct line with a currently heavily-travelled segment of I-395 resulting in

downwind impacts of an accumulated emissions queue. The Air Quality Analysis does not evaluate the Project's added impacts at the Hoffman-Boston school, where current impacts of $PM_{2.5}$ are likely already much higher than the region's high $PM_{2.5}$ background levels. Concentrations well in excess of the NAAQS for $PM_{2.5}$ likely will occur at that location as a result of the added $PM_{2.5}$ impacts from operation of the Northern Section.

103. The Air Quality Analysis also does not evaluate other important locations that are in close proximity to the Project and are aligned with wind directions that will exacerbate the accumulation of emissions at those locations. These include other locations in Arlington County: (i) Oakridge Elementary School (approximately 1,300 feet from the eastern edge of I-395, north of the Glebe Road interchange) and Abingdon Elementary School (approximately 1,600 feet from the western edge of I-395, north of the King Street interchange), both of which serve a predominately minority population; (ii) Pentagon City Hospital, immediately adjacent to the Project, north of the Glebe Road interchange; and (iii) Lynne House of Potomac Valley, approximately 1,000 feet from the Project near the Seminary Road interchange.

104. The Air Quality Analysis does not include information concerning the reliability of predictions of traffic volumes, an important overall parameter in determining congestion and, therefore, pollutant emissions and concentrations. Nor does it evaluate potential changes in driver behavior, *e.g.*, induced single occupancy vehicle usage and abandonment of transit and carpools, as a result of access to HOT lanes and how such behavior will impact the operation of the HOT facility, the general purpose lanes, the new access points, the modified interchanges and the local intersections and the resultant environmental and public health consequences.

105.   Defendants rely on the results of a study of the operation of highway SR-91, a HOV/HOT lanes facility in southern California, but such reliance is inappropriate. The SR-91 circumstances differ significantly from those of the Project. The SR-91 is a ten (10) mile stretch of roadway that did not have any HOV facility prior to its commencement as HOV/HOT lanes. The study shows the positive correlation between the HOT lanes and upper levels of income for the SR-91 commuters. It also shows that middle income commuters are particularly sensitive to pricing and are less willing to pay higher tolls despite worsening congestion. There are no other data in the VDOT Air Quality Analysis or the IJR that may indicate behavioral patterns among commuters as a result of the toll lanes, an important determinate in projecting traffic volumes, congestion, levels of service on roadway segments and adjacent intersections, and the resultant impacts on air quality. There are no analyses relied on by defendants to show the impact of the HOT lanes on the original intended purpose of the HOV system to provide a travel incentive for transit, vanpools and carpools.

106.   Traffic congestion and roadway vehicle speeds are  integral factors in proper air quality analysis for the Northern Section because these factors relate directly to air emissions. The Categorical Exclusion supporting documentation does not include (i) single occupancy vehicle volumes; (ii) emissions in tons per year or pounds per day for air pollutants; or (iii) average vehicle speeds on any segments of the Northern Section over the course of the Project timeline. Without a presentation of these data, the Project's overall premise of congestion reduction cannot be demonstrated and the Northern Section's environmental and public health impacts cannot be fully evaluated and disclosed to the public.

107.   The Air Quality Analysis does not present air emissions that are specific to its current design and scope and that are necessary to determine if the Project's current design

and scope conform to Virginia's and regional air quality plans or, instead, if the Project has been significantly altered since defendants' initial conformity evaluations.  42 U.S.C. § 7506 (c)(2)(C).  In fact, recent acknowledgement by VDOT of the need for additional scoping review and modifications will alter the Project and require a new air emissions analysis.

108.   The Air Quality Analysis does not present Project emissions data or predictions of background air quality over the Project's operational timeframe.  Project emissions and background data are necessary to ensure that all conformity tests, *i.e.*, both for regional SIPs and localized hot spot conformity requirements, are met for the year of highest expected cumulative emissions, which includes both background emissions and the Project's emissions.  Emission tallies are not correctly identified, however, for legitimate conformity analysis.  Furthermore, due to the lack of adequate and correct underlying traffic projections, air emissions cannot be accurately calculated to determine whether conformity requirements are satisfied and the public health protected.

109.   Traffic volumes and other design features for the Northern Section likely will change during and following review of the Southern Section.  Therefore, the hot spot analysis of the Air Quality Analysis cannot currently satisfy the Clean Air Act requirement for evaluation of the Project in its entirety.  40 C.F.R. § 93.123(c)(2).

110.   Acute effects from CO exposure occur from the formation of carboxyhemoglobin in blood, inhibiting oxygen intake.  At low concentrations, health effects of carbon monoxide exposure range from fatigue for healthy people to chest pain for people with heart disease. Moderate to high levels of exposure can lead to impaired vision and coordination, headaches, dizziness, confusion, nausea and reduced brain function.  The Clean Air Act requires that the Project show that CO emissions will not increase to the extent to

cause or contribute to any new violation of the CO NAAQS or increase the severity and frequency of any existing violation of the CO NAAQS in any area.  42 U.S.C. § 7506 (c)(1)(B).  This showing must be based on a quantitative analysis using the applicable air quality models, data bases and other requirements set out in 40 C.F.R. Part 51, Appendix W (Guidelines on Air Quality Models).  40 C.F.R. § 93.123(a).

111.    A primary purpose of Appendix W procedures is to ensure that modeled simulations predict a project's worst case potential impacts.  In great part, emissions impacts are determined by proximity to the roadway source, the height of the location and orientation with respect to wind direction, in addition to roadway strength factors like volumes, all factors which when considered together warrant the placement of as many receptors as the model allows to evaluate all of the potential worst case conditions.  The United States Environmental Protection Agency's guidelines for project level analysis and modeling roadway intersections recommends placement of receptors at property lines of schools, hospitals, rest homes and other areas to which the general public has access.  The Air Quality Analysis relies on only eleven analysis receptors at a few selected interchanges and local intersections to attempt to capture the potential worst-case CO impacts along the full 36-mile length of the Northern Section.  However, not all impacted intersections in Arlington County are addressed by these receptors and, in other cases, certain impacted intersections are inadequately covered by too few receptors.  The Clean Air Act requires that the CO hot spot analysis include intersections that the Project will affect with existing Levels-of-Service of D, E or F or those that will change to Levels-of-Service D, E or F because of increased traffic volumes related to the Project.  40 C.F.R. § 93.123 (a)(1)(ii).  This project affects multiple intersections in this way, but the Air Quality Analysis does not include these in the CO hot spot analysis.  In fact,

because the IJR analysis is deficient, the number of impacted intersections is understated in the IJR and the Air Quality Analysis.

112.    In 2008, prior to the approval of the Categorical Exclusion for the Project, EPA issued an "Advance Notice of Potential Rulemaking:  Regulating Greenhouse Gas Emissions Under the Clean Air Act."  The EPA set out a litany of overwhelming evidence of environmental degradation caused by GHGs and identified vehicle use as the dominant source of carbon dioxide ("$CO_2$"), a primary GHG pollutant.  The EPA also has issued a finding that GHGs contribute to air pollution and pose a threat to the public health.  The Metropolitan Washington Council of Governments ("COG") has identified the regional impacts from climate change if GHGs are not reduced.  These impacts include, but are not limited to, increased flooding, shoreline loss, degraded water quality, increased health risks, increases in harmful algae blooms and more frequent forest fires.

113.    The current I-95/I-395 corridor is a significant source of regional GHGs. The Air Quality Analysis does not show emission totals of GHGs for the Project or its "No-Build" alternative.  The Air Quality Analysis sets out factors that are strong evidence of an increase of GHGs if the Project were to be built:  (i) increases in vehicle miles traveled; (ii) increases in peak hour traffic volumes along roadway segments and at interchanges; and (iii) increases in MSAT emissions.  Such an increase in GHG emissions for the Project over its "No-Build" alternative fully undermines the defendants' premise of congestion reduction.

114.    The Air Quality Analysis does not include an analysis of GHGs.  In its Documentation of Review, the FHWA specifically states that, because they are more appropriately addressed minimally at the regional level and as they relate to climate change do not readily lend to analysis at the local level, GHGs were not addressed.  However, this

explanation is illogical given that the Northern Section is a regional transportation project that

has been deemed "regionally significant" for purposes of Federal conformity analysis.  There

are other transportation projects of similar scale, including with HOT lanes, that have been

quantitatively analyzed by other states and metropolitan planning organizations to calculate

and evaluate the impacts of GHGs from such projects.

**CLAIMS FOR RELIEF**
**COUNT I**
**(Violation of NEPA-Invalid Categorical Exclusion)**

115.     Plaintiff realleges and incorporates by reference paragraphs 1 through 114

as set forth fully herein.

116.     NEPA requires defendants to evaluate the potential environmental impacts

of the Project and to consider the environmental impacts of a federal action that will

significantly affect the quality of the human environment through issuance of an environmental

impact statement.  42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.3.

117.     NEPA compliance is triggered with respect to the Northern Section of the

Project as a result of, among other reasons, the requisite approval by the FHWA of new points

of access to or exit from I-95/I-395.  23 U.S.C. § 111(a).

118.     In the event a determination cannot be made concerning the scope of

impacts, NEPA requires the preparation of an Environmental Assessment to determine whether

an Environmental Impact Statement is warranted.  40 C.F.R. § 1501.4(b).  The Environmental

Assessment must "provide sufficient evidence and analysis for determining whether" the

project will have a significant impact on the environment.  40 C.F.R. § 1508.9 (a)(1).

119.    Defendants prepared neither an Environmental Impact Statement nor an Environmental Assessment but determined that the Northern Section should be categorically excluded from the NEPA environmental review requirements.

120.    The Categorical Exclusion does not provide a reasonable basis on which FHWA and VDOT may make a fair and rational determination that the Project does not significantly affect the human environment.

121.    In selecting a Categorical Exclusion classification for the Project, defendants sought to ensure a desired outcome, *i.e.*, no extensive environmental review and public scrutiny.  The Categorical Exclusion determination was pushed through quickly before the end of the outgoing administration in the Federal government and is based on a knowingly inaccurate description of the Project, and woefully inadequate and flawed data, to further ensure the desired outcome and obviate the need for further environmental review and public scrutiny through an Environmental Assessment process.

122.    Defendants' determination that the Northern Section of the Project would not have a significant impact on the human environment and therefore is excluded from the requirement for a comprehensive environmental review is arbitrary, capricious and not in accordance with law.

123.    This Court should set aside the Categorical Exclusion for the Northern Section of the Project and order a full and comprehensive environmental review, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

## COUNT II
### (Violation of NEPA-Improper Segmentation)

124.    Plaintiff realleges and incorporates by reference paragraphs 1 through 123 as set forth fully herein.

125.    NEPA requires defendants to evaluate the potential environmental impacts of the Project and to consider the environmental impacts of a federal action that will significantly affect the quality of the human environment through issuance of an environmental impact statement.  42 U.S.C. § 4332(C), 40 C.F.R. § 1502.3.

126.    The regulations that implement and construe NEPA have clarified that an environmental impact is "significant" if "it is reasonable to anticipate a cumulatively significant impact on the environment."  40 C.F.R. § 1508.27(b)(7).

127.    "Cumulative impact is the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions. . . .  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

128.    The regulations have clearly prohibited the tactic of segmenting a single project into "small component parts."  40 C.F.R. § 1508.27.

129.    To the contrary, an agency must consider connected or cumulative actions in a single environmental review document.  40 C.F.R. § 1508.25(a)(1)-(2).

130.    The Northern Section and the Southern Section of the Project are artificial subdivisions of a project that, in reality, is single, unitary and interdependent.  The two sections are adjacent to one another, and serve the same goal of permitting continuous HOT access from Spotsylvania County to Arlington County.  The entire Project was designed by the same principals (namely, defendants), who have, in numerous other settings and on numerous other occasions, presented the Project as if it were unitary and interdependent.  Defendants' initial inaccuracies in defining the Project, and the Northern Section, and, despite a final Categorical

Exclusion determination, their acknowledged need for a significant post-determination scope of review for the Northern Section are inherently arbitrary and capricious actions.

131.   Upon information and belief, defendants attempted to subdivide the Project into these two segments for the sole purpose of skewing the results of FHWA's and VDOT's analyses of whether an Environmental Impact Statement would be required under NEPA for the Northern Section.

132.   Upon information and belief, defendants desired to avoid a full and comprehensive environmental review for the Northern Section to avoid revelations that the Project will disproportionately endanger the health and welfare of the residents of Arlington County, including its minority and low-income residents and vulnerable populations, for the purpose of granting nearly exclusive benefits to affluent residents of exurban areas who chose to live in exurban sprawl and their developers.

133.   NEPA's analysis of the "Northern Section" of the Project was inadequate and, hence, the Categorical Exclusion does not provide a reasonable basis on which FHWA and VDOT may make a fair and rational determination that the Project does not significantly affect the human environment.

134.   Defendants' determination that the Northern Section of the Project would not have a significant impact on the human environment and therefore is excluded from a comprehensive environmental review is arbitrary, capricious and not in accordance with law.

135.   This Court should set aside the Categorical Exclusion classification for the Northern Section of the Project and order a full environmental review, pursuant to 5 U.S.C. § 706.

## COUNT III
## (Violation of Clean Air Act)

136.    Plaintiff realleges and incorporates by reference paragraphs 1 through 135 as set forth fully herein.

137.    Section 176(c) of the Clean Air Act establishes mandatory requirements that must be satisfied before any department, agency or instrumentality of the Federal Government may engage in, support in any way or provide financial assistance for, a license or permit, or approve any activity, including a transportation project.  42 U.S.C. § 7506(c).  Any such activity must conform to an implementation plan after it has been approved or promulgated under 42 U.S.C. § 7410.

138.    Defendants were required to demonstrate conformity for the Project "according to the consultation requirements of [40 C.F.R.] § 93.105(c)(1)(i) and the methodology requirements of [40 C.F.R.] § 93.123."  40 C.F.R. § 93.116(a).

139.    Defendants failed to demonstrate conformity following these requirements, particularly the methodological requirements for determining $PM_{2.5}$ concentrations pursuant to 40 C.F.R. § 93.123(b) and for CO concentrations pursuant to 40 C.F.R. § 93.123(a).

140.    The defendants' grant of a Categorical Exclusion for the Northern Section of the Project is evidence that defendants engaged in, supported and approved the Project within the meaning of 42 U.S.C. § 7506(c).

141.    Defendants' grant of a Categorical Exclusion for the Northern Section of the Project is therefore arbitrary, capricious and not in accordance with law.

142.    This Court should therefore set aside the Categorical Exclusion classification for the Northern Section of the Project, pursuant to 5 U.S.C. § 706.

**COUNT IV**
**(Title VI of the Civil Rights Act)**
**(Secretary LaHood, Secretary Homer, Administrator Mendez and VDOT)**

143.   Plaintiff realleges and incorporates by reference paragraphs 1 through 142 as set forth fully herein.

144.   Title VI of the Civil Rights Act provides:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

145.   Section 1983 of Title 28 of the United States Code further provides: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress. . . ."

146.   Defendants' deliberate and insidious actions and their related failure to act, will have harmful, disparate and discriminatory impacts on and the denial of benefits to low-income and minority people within, along and near the Project.

147.   Under Title VI of the Civil Rights Act of 1964, discrimination on the ground of race, color, or national origin may not occur in connection with programs and activities receiving Federal financial assistance.

148.   The Act requires that public funds not be spent in a manner that encourages, entrenches, subsidizes or results in racial discrimination whether on the basis of color or national origin.

149.    The legal requirements of the Act have been explicitly and intentionally violated by the segmentation of the Project, in addition to its approval and planned implementation without proper traffic and environmental analyses.

150.    The implication of the I-95/I-395 corridor in a project that has been segmented and inadequately studied to serve the interests of more affluent, non-minority citizens over less affluent, minority citizens is an overt violation of this Act.

151.    By serving the needs and interests of the more affluent, non-minority persons affected by the Project and discounting the negative impacts upon certain minority populations along the corridor of the Project, defendants' actions have been undertaken with the explicit intent of effecting discrimination upon a protected class of minority persons.

152.    In failing to adequately examine the resulting health and environmental effects among minority, low-income populations, defendants have disregarded their duties under the Act, effecting illegal discrimination upon those persons.

## COUNT V
### (Due Process/Equal Protection)
### (Secretary LaHood, Secretary Homer, Administrator Mendez and VDOT)

153.    Plaintiff realleges and incorporates by reference paragraphs 1 through 152 as set forth fully herein.

154.    The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws."

155.    The Fifth Amendment to the United States Constitution provides: ". . .nor shall [any person]. . . be deprived of life, liberty, or property, without due process law."

156.    Section 1983 of Title 28 of the United States Code further provides: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress. . . ."

157.    Based on the facts set forth above, it can be inferred that defendants acted with an invidious discriminatory purpose, ignoring or circumventing proper policies and procedures, segmenting the Project to serve a discriminatory end, and choosing to willfully overlook obvious, requisite deficiencies, considerations, alternatives, and mitigation measures.

158.    The deliberate disparate and discriminatory nature of this publicly-supported and owned Project is clearly illustrated by the distinct racial and income demographics of the Northern Section in relation to the Southern Section of the Project.

159.    Defendants have undertaken the Project, and invoked the use of public funding, to serve the interests of wealthy, predominantly white Virginia residents from the southernmost counties affected by the Project and at the obvious expense of the largely less affluent, predominantly minority and ethnic populations that reside in and along the corridor of the Northern Section, in particular in Arlington County.

160.    The Project will likely increase traffic congestion on the local roads throughout the corridor, in areas in which there are predominately minority and low-income populations. The Project's increase in air pollutants emissions, particularly in areas with high

concentrations of minority and low-income citizens, will be to the detriment of public health, particularly for affected vulnerable populations and low-income, minority communities. In violation of those residents' Constitutional rights, proper inquiry has not been done regarding the health and environmental effects that would result from such an increase.

161.    The government interest being served by the Project has not been adequately balanced by the appropriateness of the government's inquiry and method of implementation. In fact, defendants' actions are arbitrary and a violation of minority residents' fundamental rights.

162.    The discriminatory impact that will result from implementation of this improperly segmented Project, coupled with the explicit discriminatory intent that can be inferred from defendants' actions, is a violation of Arlington County's minority residents' right to equal protection under the 14th Amendment of the United States Constitution and due process under the 5th Amendment of the United States Constitution.

### COUNT VI
### (Virginia Constitution – Due Process)
### (VDOT and Secretary Homer)

163.    Plaintiff realleges and incorporates by reference paragraphs 1 through 162 as set forth fully herein.

164.    Article 1, § 11 of the Virginia Constitution provides:  "That no person shall be deprived of his life, liberty, or property without due process of law… and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged…"

165.    Based on the facts set forth above, defendants acted with an invidious discriminatory purpose, ignoring or circumventing proper policies and procedures, segmenting

the Project to serve a discriminatory end, and choosing to willfully overlook obvious, requisite inquiries and reviews.

166.     The deliberate disparate and discriminatory nature of this publicly-supported Project is clearly illustrated by the distinct racial and income demographics of the Northern Section in relation to the Southern Section of the Project.

167.     Defendants have undertaken the Project, a public roadway, and invoked the use of public funding, to serve the interests of wealthy, predominantly caucasian Virginia residents from the southernmost counties affected by the Project and at the obvious expense of the largely less affluent, predominantly minority and ethnic populations that reside in and along the corridor of the Northern Section, in particular in Arlington County.

168.     The Project will increase traffic congestion on the local roads throughout the corridor, in areas in which there are predominately minority and low-income populations. The Project's increase in air pollutants emissions will be to the detriment of public health, particularly for affected vulnerable populations and low-income, minority communities. In violation of those residents' Constitutional rights, proper inquiry has not been done regarding the health and environmental effects that would result from such an increase.

169.     The government interest being served by the Project has not been adequately balanced by the appropriateness of the government's inquiry and method of implementation. In fact, defendants' actions are arbitrary and a violation of minority residents' fundamental due process and equal protection rights.

170.     The discriminatory impact that will result from implementation of this improperly segmented Project, *i.e.*, the Northern Section, coupled with the explicit discriminatory intent of defendants' actions, is a violation under Article 1, § 11 of the Virginia

Constitution of the rights of residents of minority and low-income communities, particularly in Arlington County.

## COUNT VII
### (Federal-Aid Highways Act ("FAHA"))

171.    Plaintiff realleges and incorporates by reference paragraphs 1 through 170 as set forth fully herein.

172.    The FAHA requires that before approving a project, defendants consider alternative courses of action and make a decision in the "best overall public interest."  23 U.S.C. §§ 109(a), (h); 23 C.F.R. § 771.105(b).

173.    FAHA requires the defendants to base their determination "upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals."  23 U.S.C. §§ 109(a), (h); 23 C.F.R. § 771.105(b).

174.    The Northern Section may not be approved unless defendants first make the findings required by 23 U.S.C. §§ 109(a), (h); 23 C.F.R. §§ 771.101, and 771.105(b).

175.    Defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by failing to make a public interest determination under 23 U.S.C. § 109(h) which addressed all of the statutory factors set out at § 109(h).

176.    Defendants violated 23 U.S.C. § 109(h) and 23 C.F.R. § 771.105(b) by failing to make a public interest determination that is sufficient as a matter of law.

177.    To the extent defendants approved the Northern Section as in the "best overall public interest," that determination was arbitrary and capricious as a matter of law.

178.    Defendants acted in an arbitrary and capricious manner when they failed to consider alternatives and to pick from among alternatives that which was in the "best overall public interest" in accordance with their statutory obligations.

179.    Defendants acted in an arbitrary and capricious manner when they approved the Northern Section without adequate record on which to make a determination that the Northern Section was in the "best overall public interest."

180.    Defendants acted in an arbitrary and capricious manner when they failed to determine the costs of minimizing or eliminating adverse effects and impacts of the proposed Northern Section contrary to their statutory and regulatory obligations.

181.    Defendants acted in an arbitrary and capricious manner when they ignored adverse effects and impacts of the Northern Section.

182.    Defendants acted in an arbitrary and capricious manner when they failed to incorporate mitigation measures and ignored those proposed.

183.    The effect of each failure and omission individually, as well as their effect in combination and cumulatively, illustrate that defendants acted in gross derogation of duty and, therefore, that their approval of the Project was arbitrary and capricious and in violation of FAHA.

## RELIEF REQUESTED

WHEREFORE, premises considered, Arlington County respectfully requests that the Court:

A.      Declare defendants' determination that the Northern Section of the Project is categorically excluded from a comprehensive NEPA environmental review to be arbitrary, capricious and not in accordance with the law;

B.      Declare that the segmentation of the Project into the Northern Section and the Southern Section is arbitrary, capricious and not in accordance with the law;

C.      Declare defendants' failure to comprehensively review the impacts of the Northern Section on the human environment and evaluate the Northern Section's disproportionate adverse treatment to minority and low-income populations to be arbitrary, capricious and not in accordance with the law;

D.      Enter judgment in favor of plaintiff that defendants have violated Title VI of the Civil Rights Act of 1964, the 5th and 14th Amendments of the United States Constitution, and the Constitution of the Commonwealth of Virginia;

E.      Hold unlawful and set aside agency action found to be (i) arbitrary and capricious; (ii) contrary to constitutional rights; and (iii) without observance of procedure required by law;

F.      Enjoin defendants from entering into an agreement with Fluor-Transurban for the Northern Section pending a comprehensive environmental and public health review for the entire Project;

G.     Enjoin defendants from continuing with the Northern Section;

H.     Order defendants to perform their duties in accordance with the law; and

I.      Reward plaintiff costs, disbursements and attorneys' fees pursuant to the Equal

Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and 28 U.S.C. § 1988.


Dated:  August 19, 2009

                              Respectfully submitted,

                              COUNTY BOARD OF ARLINGTON
                              By Counsel

                              Stephen A. MacIsaac, (*Pro Hac Vice to be filed*)
                              County Attorney
                              County Board of Arlington
                              Suite 403
                              2100 Clarendon Blvd.
                              Arlington, VA 22201
                              Telephone :  (703) 228-3100
                              Telefax :  (703) 228-7106
                              Email :  smacisaac@arlingtonva.us



SCHNADER HARRISON SEGAL & LEWIS LLP


By:    _John B. Britton_____
       John B. Britton (#426434)
       750 9th Street NW, Suite 550
       Washington, DC 20001
       Telephone: (202) 419-4218
       Telefax: (202) 419-4258
       Email: jbritton@schnader.com



                                        PHDATA 3227506_1

# EXHIBIT A

# Documentation of FHWA Review

## I-95/I-395 HOV/Bus/HOT Lanes Project
## 0095-96A-107, PE101; UPC #70849

Based on the preliminary environmental impact information compiled by VDOT through the State Environmental Review Process and extended discussions with our Headquarter's Office regarding a variety of environmental issues including independent utility and logical termini, FHWA approved this project as a Categorical Exclusion (CE) on August 31, 2006, with conditions. In June of 2007, FHWA reconsidered and affirmed its decision to prepare a CE when we were made aware of proposed changes to the scope of the project at the southern end to address one of these conditions. Based on my review of the CE and supporting documentation submitted by VDOT as well as additional discussions and the resolution of issues with them, I find this documentation acceptable and sufficient to support the original CE determination.

The scope of the project covered by the CE and supporting document includes the following components:

> Re-stripe the existing two-lane HOV facility from Eads Street to 0.6 miles south of the Route 234 interchange to three HOV/HOT lanes;

> Construct two new HOV/HOT lanes in the median from the existing terminus south of Route 234 to just south of Joplin Road and extend a single HOV/HOT lane to just north of Route 610 (Garrisonville Road);

> As identified in the draft Interchange Justification Report dated October 2008, add new entry/exit points between the general purpose lanes and the HOV/HOT lanes at eleven locations; modify four existing entry/exit points; and upgrade an existing ramp to a direct flyover ramp;

> New structures include a Lorton Bus-rail Transfer Station pedestrian bridge and the structures associated with the flyovers that will provide access between the HOV/HOT lanes and the general purpose lanes; existing structures at Telegraph Road over I-95 and the Franconian-Springfield pedestrian bridge will be replaced.

The CE supporting documentation reviewed to support this decision consisted of the following:

> Noise Analysis Technical Report, December 2008;
> Air Quality Analysis Technical Report, November 2008;
> Joint Permit Application, October 2008;
> Draft Interchange Justification Report, October 2008;
> Existing Conditions Report, March 2008;
> Section 4(f) Applicability Analysis, December 2007;

As referenced above, FHWA concurred with VDOT's recommendation to prepare a CE on August 31, 2006, with conditions. Those conditions were as follows:

1. FHWA required that a series of Citizen Information Meetings (CIM) be held (at least three) in the corridor to present the project to the public and solicit their input prior to the completion of the CE. Based on the results of these CIMs, FHWA would reassess its decision to prepare a CE. In addition, even though no right-of-way acquisition was anticipated, FHWA also required a public hearing be held upon completion of the environmental documentation.

   **Status:** Five CIMs were held in the corridor on July 23, 24, 25, 26, and 30, 2007. A summary of the CIMs and the issues raised were presented to FHWA for consideration. While the CIMs tried to focus the public on environmental issues, only 26 of the 427 comments submitted addressed environmental issues. In addition, a lot of questions were submitted via e-mail on the project, which were then synthesized into 97 questions. Of these, only three related to environmental matters. In all, none of the environmentally-related comments or questions that were submitted raised any issues that were not already considered or being addressed as part of the development of the environmental documentation for the project. Accordingly, FHWA saw no cause to change its decision to prepare a CE based on the results of the CIM. Finally, public hearings will be held in early 2009.

2. FHWA required that an analysis be conducted to demonstrate that the proposed project would not have a significant impact on travel patterns, which is one of the regulatory requirements that must be met for a CE.

   **Status:** An analysis has been conducted and is ongoing as part of the interchange justification report process that addresses the travel pattern issue. This analysis shows that the project will not have a significant impact on travel patterns but identified eight locations where there would be a negative impact on operations. At these locations, improvements are proposed and identified in the draft Interchange Justification Report to mitigate these negative impacts on operations. A final decision on these proposed improvements will be made by FHWA when the Interchange Justification Report is formally submitted by VDOT for review and approval. Generally speaking, the majority of proposed improvements involve geometric improvements, signalization, and the modification of ramps that do not normally have a significant impact on the environment. To the extent that these proposed improvements are not already considered within the existing scope of the project, a decision will be made when they are approved whether additional environmental analysis is needed to account for them in the project scope.

3. FHWA required that the consultant identify the design exceptions that would be needed to accommodate the project and initiate the process for seeking approval of those design exceptions prior to the completion of the NEPA process.

**Status:** Possible design exceptions have been identified, and the design exception process was initiated on a parallel track with the development of the environmental documentation. Many discussions, meetings, reviews and workshops have been held related to design exceptions, and VDOT and their general engineering consultant are conducting their final reviews before approval and submittal to FHWA. The supporting documentation for the CE for the current scope assumes that the design exceptions that appreciably affect the footprint and assessment of direct impact will be approved, which appears to be a reasonable assumption at this point in the project development process.

4.  FHWA required that the consultant work with WashCOG to determine if the proposed project represented by the re-striping and shoulder reconstruction represented a regionally significant project subject to conformity.

    **Status:** The project was added to the long range plans for both the Washington D.C. metropolitan area and the Fredericksburg region and subject to conformity. The project is currently in a conforming transportation improvement program and long range transportation plan for these two areas and is consistent with the scope and concept used to demonstrate conformity.

5.  FHWA required that the consultant demonstrate that the proposed project represented by the re-striping and shoulder reconstruction did not point the proverbial loaded gun at the roadway network at either termini forcing additional improvements be made beyond the scope of our project. Should the project trigger additional problems needing resolution, the project would need to be designed accordingly to preclude them.

    **Status:** This has been done with the documentation submitted by VDOT on December 18, 2008, which adequately demonstrates that the HOT Lanes project will not point the proverbial loaded gun at the transportation network at the northern end creating operational issues that worsen traffic conditions above and beyond what can be expected at these locations if the HOT Lanes project was not developed (i.e. No-Build condition) and thereby, requiring/triggering the need for additional improvements that are not already included in the scope of the project. At the southern end of the project, approximately nine miles of additional improvements have been added to the scope of the project to address this issue.

Prior to submitting the CE and supporting documentation to FHWA for review, VDOT received a handful of letters asking that they refrain from submitting the documentation to FHWA for approval pending the resolution of several concerns that were identified. These letters came from the Northern Virginia Transportation Commission, Potomac and Rappahannock Transportation Commission, and the Northern Virginia Transportation Authority. FHWA has reviewed these letters and determined that they do not raise any

environmental issues that would prevent FHWA from completing its review of the CE and the supporting documentation. The issues raised involve design, safety, enforcement, public outreach, operational, toll and revenue, commuter parking, etc. that are being addressed by the project sponsors. Should the resolution of these issues or concerns result in changes to the scope of the project, additional environmental analysis may be required.

There are a few specific environmental issues that are worth highlighting as well as the manner in which the issues were resolved.

A variety of air quality-related issues were addressed in the Air Quality Analysis Technical Report:

1.  A quantitative mobile source air toxics (MSAT) analysis was prepared for six toxics which showed that there would be marginal increases in the production of MSAT pollutants between the No-Build and the Build alternatives on the affected network (less than two percent in 2030). However, this increase would be more than offset by the reduction in MSAT pollutant production predicted to occur when the Build alternative is compared to the existing year condition. Therefore, despite increases in traffic between 2006 and 2030, the overall MSAT emissions in the corridor are expected to decrease significantly during this period in the magnitude of 30% or more.

2.  Regarding PM2.5, the project is considered a project of air quality concern and a qualitative analysis was prepared which showed that the project would not cause or contribute to any new localized PM2.5 violations or increase the frequency or severity of any existing violations or delay timely attainment of the National Ambient Air Quality Standards for PM2.5.

3.  A micro-scale carbon monoxide (CO) analysis was prepared which demonstrated that the predicted one and eight-hour CO concentrations for the project would be well below the National Ambient Air Quality Standards for CO.

4.  The project was subjected to the transportation air quality conformity requirements. In this regard, the project comes from the FY 2008-2013 TIP and 2007 CLRP for the Washington, D.C. Metropolitan Area found to conform with the Clean Air Act requirements for the 8-hour ozone standard and regional PM2.5 by FHWA and FTA on June 11, 2008. The project also comes from the FY 2007-2010 TIP and FY 2030 CLRP for the Fredericksburg region found to conform with the Clean Air Act requirements for the 8-hour ozone standard by FHWA and FTA on September 16, 2008.

Greenhouse gas emissions (as they relate to global climate change) were not addressed as part of the Air Quality Analysis. Climate change is inherently a global issue that is more appropriately addressed, minimally, at the regional level or even more appropriately at the state or national level by assessing the impact of transportation systems as opposed to individual projects. Further, climate change does not readily lend itself to an analysis at

the local level, and national standards have not been established. Relative to the scope of global climate change, any change in greenhouse gas levels as a result of the project are likely to be insignificant. The magnitude of the changes in climate caused by the project and any corresponding impacts on environmental resources would be too small to measure since current analytical tools are not sophisticated enough to accurately reflect minute differences. Attributing any environmental consequences to the differences in emissions or assessing how they contribute to impacts occurring around the world is not possible in any meaningful way. As a result, we cannot have confidence that the assessment of greenhouse gas emissions from the project will yield information that will be helpful to the public or relevant to project decision making.

A noise analysis was prepared for the project which determined that there are a total of 5,023 dwelling units exposed to noise impacts under the existing condition in the project corridor. Under the 2030 No-Build condition, 5,107 homes are predicted to be impacted. Under the 2030 Build condition, 5,225 homes will be exposed to noise impacts. In all cases, the noise impact is one where the FHWA Noise Abatement Criteria will be approached or exceeded. For the overwhelming majority of receptors, the difference in noise levels between the 2030 Build condition and the 2030 No-Build condition or the 2006 existing condition will be marginal (less than 3 dB(A)). In no instance will the noise impact be one of a substantial increase over existing noise levels. To address these noise impacts, noise barriers are being considered. It is estimated (based on a cost of $45/sq. ft.) that approximately $60 million worth of reasonable noise barriers can be constructed, which would protect 3,874 impacted receptors and benefit another 4,467 receptors not currently impacted. Further, approximately $8.7 million worth of noise barriers will be needed to replace existing noise barriers. Finally, approximately $8.5 million worth of barriers are under consideration to protect recreational land uses. These noise barrier estimates are considered preliminary at this point; a final decision on noise barriers will be made after additional design information is developed and reviewed by the joint FHWA-VDOT Noise Abatement Committee.

The project, including stormwater management measures, will impact approximately 5.5 acres of wetlands which includes impacts to forested, scrub-shrub, and emergent wetlands. The majority of these impacts will occur south of Dumfries Road where the project will construct new lanes within the existing undisturbed median, which is characterized primarily by vegetation and forested resources. North of Dumfries Road where the project consists of restriping the existing HOV lanes, wetland impacts are minimal and for the most part, limited to stream crossings and wetlands located in forested areas along the edge of the existing facility. Wetland impacts will be mitigated through the purchase of wetland and stream bank credits as well as the restoration and buffering of streams. A review of the joint permit application demonstrates that the project has avoided and minimized impacts to wetlands to the extent practicable given the scope of the project. For example, wetlands located in the median have been avoided where sufficient width exists in the median to accommodate both the proposed project and wetlands. Elsewhere, at stream and creek crossings, wetland impacts have been minimized by perpendicular crossings while avoidance is impractical since the crossings traverse the entire right-of-way. Therefore, in accordance with Executive Order 11990, *Protection of Wetlands*, it has been determined that there is no practicable alternative to the proposed construction in wetlands and that the proposed action includes all planning to minimize harm to wetlands which may result from such use as demonstrated by the joint permit application under review by the USACE.

There are no known archeological sites within the archeological area of potential effect that will be impacted by the project. Several previously recorded sites within the area of potential effect were reviewed in the field but most of them have been destroyed. Several new archeological deposits/sites were identified during the surveys for this project, but most of them are not considered eligible for the National Register. A handful of sites within the area of potential effect were determined to be potentially eligible, but these sites are outside the area of disturbance for the project and will be avoided. Therefore, additional work necessary to make a formal determination of eligibility is not needed. Six existing architectural resources were identified within the architectural area of potential effect (Farlington Historic District, Marumsco Acres Subdivision, Cardinal Drive area, Van Buren Drive, Prince William Forest Park, and Aquia Church), and the Virginia State Historic Preservation Officer (SHPO) concurred with a conditional no adverse effect determination on August 5, 2008. Of particular interest to the SHPO is the design and placement of the noise barriers in the vicinity of Fairlington Historic District, a National Register of Historic Places-listed property. As a condition of the no adverse effect determination, VDOT will submit information to the SHPO on the location and design of sound barriers if they are included in the project to protect the Farlington Historic District.

This CE is approved in accordance with 23 CFR 771.117(d). VDOT submitted documentation which demonstrates that the specific conditions or criteria for CEs are satisfied and that significant environmental effects will not result. Specifically, the project will not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, or historic or other resource; do not involve significant air, noise or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts. As with any CE and supporting documentation which is presented to the public at a public hearing following FHWA approval, FHWA's approval is contingent upon FHWA not receiving any comments that raise environmental issues not already considered or raise the prospect of significant environmental impacts.

_____ 1/7/09
Approving FHWA Official

# Categorical Exclusion (CE)

| Project Information | | | |
|---|---|---|---|
| **Project Name:** | I-95/I-395 PPTA HOT Lanes | **Federal Project#:** | NH-095-2(487) |
| **Project Number:** | 0095-96A-107, P101 | **Project Type:** | Construction |
| **UPC:** | 70849 | **Charge Number:** | 00070849, Activity 605 |
| **Route Number:** | 95 | **Route Type:** | Interstate |
| **Project Limit:–From:** | Eads St. Interchange - Arlington, VA | **To:** | Garrisonville Road Interchange - Stafford, VA |
| **Additional Project Description:** | Re-striping existing two-lane HOV facility from Eads Street to 0.6 mi south of Rte. 234 interchange to three HOV/HOT Lanes; from Rt. 234 south to Rt. 610 Garrisonville exit, new HOV/HOT lanes construction in median. Flyovers and slip ramps will connect HOV/HOT lanes to existing general purpose lanes. | | |
| **District:** | **City/County:** | | **Residency:** |
| Northern Virginia | Northern Virginia District Wid | | |

**Date CE level document approved by VA Division FHWA:** 08/31/2006
**FHWA Contact:** Sundra, Edward S
**Project in STIP:** Yes          **In Long Range Plan?** Yes
**CE Category 23 CFR 771.117:** d01
**Description of Category:** Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (e.g. parking, weaving, turning, climbing).
**Logical Termini and Independent Utility:** Yes
**Comments:** FHWA concurred with proj. issues of scope, logical termini & independent utility on Aug 31, 2006. FHWA identified 5 conditions to be met for approval of a CE: 1) Citizen Information Meetings, 2) traffic analysis without significant impact on travel patterns, 3) design exceptions identified & approval process initiated prior to completion of CE, 4) if proj. is regionally significant & include in conforming CLRP for construction, & 5) demonstrate proj. does not force additional improvements be made beyond scope of this project (if operational problems are identified, project must be designed to preclude them). Documentation addressing compliance with 5 conditions is provided with CE. Springfield Interchange Phase VIII which provides HOV connections between I-95/395/495 is under construction. No final decision has been made to convert Ph VIII HOV to HOT for continuous HOT Lane system. When oper. analyses are complete & decision is made, need for more env. documentation will be assessed
**Typical Section:** Eads St. to Shirlington Rotary - three 11' lanes with variable shoulders. Shirlington Rotary to Prince William Pwy. - 2.5'left shoulder-11'lane-12'lane-11'lane-10'right shoulder. Prince William Pwy. to Dumfries Rd. - three 12' lanes with 12' shoulders. Dumfries Rd. to Garrisonville Rd. - two 12' lanes with 12' shoulders.
**Structures:** New structures: Lorton Bus-rail Transfer Station Pedestrian Bridge; 7 General purpose lane-to-HOT Lanes/HOT-to-GP flyovers at various locations; new HOT Lanes bridges over Aquia, Chopawamsic Creeks, Russell Rd. & Joplin Road. Structures to be replaced: Telegraph Rd. over I-95; Franconia-Springfield Pedestrian Bridge.

| SOCIO-ECONOMIC |
|---|

**Minority/Low Income Populations:** Present with no impact   **Disproportionate Impacts to Minority/Low Income Populations:** No
   Source: I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008
**Existing or Planned Public Recreational Facilities:** Present with no impact
**Community Services:** Present with no impact
**Consistent with Local Land Use:** Yes
   Source: I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008
**Existing or Planned Bicycle/Pedestrian Facilities** Not Present
Source: I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008
**Socio-Economic Comments:** Seventy-seven community facilities and services, primarily places of worship, and schools are within the project study corridor. Eleven emergency services facilities are present in the study corridor. No community service would be directly affected by the proposed project.

Twenty recreational facilities are in close proximity to the proposed project. Based on the most current design plans available, the proposed project will not impact any of the facilities.

No bicycle or pedestrian facilities are incorporated into the proposed interstate system project.

| SECTION 4(f) and SECTION 6(f) |
|---|

**Use of 4(f) Property:** No
   Source: Section 4(f) Applicability Analysis, December 2007. Twenty-five 4(f) properties are in close proximity to the proposed project. Based on the most current design plans available, the proposed project will not require the use of any of the properties and a formal 4(f) evaluation will not be required.
**6(f) Conversion:** No   **Acres of Conversion:**
**4(f) and 6(f) Comments:** No 6(f) property was identified in proximity to the proposed project.

| CULTURAL RESOURCES |
|---|

**Section 106 Effect Determination:** NO ADVERSE EFFECT
**Name of Historic Property:** Fairlington Historic District        **DHR Concurrence date:** 08/05/2008
**MOA Execution Date:** None
**Cultural Resource Comments:** As a condition of VDHR's No Adverse Effect, it will be necessary to coordinate any Fairlington Historic District noise barrier plans with local governments and VDHR for review and consideration and provide any local government's comments to VDHR for consideration.

## NATURAL RESOURCES

**Waters of the U.S.:** Present with impacts  Compensatory Mitigation Required
**Linear Feet of Impact:** 10727
**Federal Threatened or Endangered Species:**
Bald Eagle  (Haliaeetus leucocephalus)-Federal:LT-Present with no impact
Dwarf Wedgemussel  (Alasmidonta heterodon)-Federal:LE-Present with impacts
Harperella  (Ptilimnium nodosum)-Federal:LE-Present with no impact
Sensitive Joint-vetch  (Aeschynomene virginica)-Federal:LT-Present with no impact
Small Whorled Pogonia  (Isotria medeoloides)-Federal:LT-Present with no impact
**T&E Review:**

| | |
|---|---|
| **100 Year Floodplain:** Present with no impact | **Regulatory Floodway Zone:** Not Present |
| **Public Water Supplies:** Not Present | **Tidal Waters/Wetlands:** Present with impacts |
| **Wetlands:** Present with impacts | **Wetlands: Acres of Impact:** 5.45    **Wetland Type:** Forested |

**Permits Required:** Yes
**Natural Resource Comments:**  According to the Virginia Department of Health, Office of Drinking Water, the Study Corridor contains no public drinking water supplies; no raw water intakes downstream, no treatment units, and no distribution system components. Responses to scoping letters from the DEQ did not contain reference to the groundwater mapping system, wellhead protection areas or groundwater recharge areas, however, according to the Virginia Department of Health, Office of Drinking Water, there are no groundwater sources in the Study Corridor that will be directly impacted by the proposed project. Locations of wetlands and streams within the project limits and their impacts are listed in the Summary of Impacts to Jurisdictional Wetlands and Other WOUS as an attachment to this CE. Demonstrated minimization of wetland and other WOUS impacts as well as required compensatory mitigation for unavoidable impacts will be coordinated with federal and state regulatory agencies during the permitting process.

## AGRICULTURAL/OPEN SPACE

**Open Space Easements:**  Not Present
**Agricultural/Forestal Districts:**  Not Present
  **Source:**  I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008
**Agricultural/Open Space Comments:**  According to Virginia Department of Agriculture and Consumer Services, only Fairfax and Prince William counties have Agricultural and Forestal Districts. There are no agricultural or forestal districts in the Fairfax County or Prince William County portions of the Study Corridor.

## FARMLAND

**NRCS Form CPA-106 Attached?**  No
**NRCS Form CPA-106 not attached because:**
  Land already in Urban use.
  Entire project in area not zoned agriculture.
**Alternatives Analysis Required?**  No
  **Source:**  I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008
**Farmland Comments:**  Soils data for Arlington, Fairfax, Prince William, and Stafford counties indicate that Prime Farmland soils are present in the Study Corridor. Soils categorized as prime farmland are present within the Study Corridor, however, the land is already converted or committed to urban development. It is not being actively farmed and no farmland would be affected.

## INVASIVE SPECIES

**Invasive Species in the project area?**  Yes
**VDCR indicated that the potential exists for some VDOT projects to further the establishment of invasive species.  All seeds used will be tested in accordance with the Virginia Seed Law to ensure there are not prohibited Noxious Weed-Seeds in the seed mixes.**
**Invasive Species Comments:**



## AIR QUALITY

**Carbon Monoxide**

This project is located in: A Carbon Monoxide Maintenance Area (Arlington and Alexandria Cos.)

CO Microscale Analysis Required for NEPA? Yes

✓ The design year 24-hour forecasted traffic exceeds the thresholds outlined in the VDOT's Memorandum of Understanding with FHWA dated August 4, 2004, and therefore a CO air quality analysis is required.

The portion of the project that lies outside of Alexandria city and Arlington county is located in a CO attainment area.

**Ozone**

This project is located in: An 8-hour Ozone Nonattainment Area

✓ This project is modeled properly for conformity in the 2007 LRP.

The majority of the project is located in the VA-DC-MD moderate 8-hour ozone nonattainment area, and was found to conform to TPB's FY 09-14 TIP and 2007 CLRP. The portion that lies in Stafford county is within the Fredericksburg 8-hour ozone maintenance area, and was found to conform to FAMPO's FY 07-10 TIP and 2030 CLRP.

**Particulate Matter**

This project is located in: A PM2.5 Nonattainment Area

✓ This project is modeled properly for conformity in the 2007 LRP.

PM Hotspot Analysis Required for NEPA? Yes

The portion of the project that lies within Stafford county is located within a fine particulate matter attainment area.

**Mobile Source Air Toxics**

This project requires: A quantitative MSAT analysis

✓ This project creates or adds significant capacity to urban highways such as interstates, urban arterials, or urban collector-distributor routes with traffic volumes where the AADT is projected to be in the range of 140,000 to 150,000, or greater, by the design year.

✓ This project is proposed to be located in proximity to populated areas in rural areas or in proximity to concentrations of vulnerable populations (i.e., schools, nursing homes, hospitals).

The I-95/395 HOV/Bus/HOT Lanes project was assessed for potential air quality impacts and conformity with all applicable air quality regulations and requirements. The models, methods, and assumptions used in this assessment, as well as the findings, are documented in a separate Air Quality Analysis. The Analysis evaluated the project's anticipated impact on carbon monoxide, fine particulate matter, mobile source air toxics (MSAT), and ozone concentrations and/or emissions in the vicinity of the project. The findings indicate that the project would meet all applicable air quality requirements of the National Environmental Policy Act (NEPA) and transportation conformity rule. As such, this project was not found to cause or contribute to a new violation, increase the frequency or severity of any violation, or delay timely attainment of national ambient air quality standards (NAAQS) as established by the US Environmental Protection Agency.

## NOISE

**Noise Scoping Decision:** Type I - Noise study required

**Barriers Under Consideration?** Yes

**Noise Comments:** The potential noise impact for the I-95/395 HOT Lanes Project was assessed in accordance with FHWA and VDOT noise assessment guidelines. The FHWA guidelines are set forth in 23 CFR Part 772. VDOT's regulations are contained within the State Noise Abatement Policy, and are consistent with the FHWA guidelines. Under existing conditions, 5023 receptors are exposed to noise impact. In the 2030 No-build condition, 5107 receptors are predicted to be impacted; in the 2030 Build condition, 5225 receptors are predicted to be impacted. Parks and recreational areas were also predicted to be impacted. Noise abatement was evaluated wherever an impact was predicted. New cost-reasonable barriers would protect 3874 dwellings and benefit 4467; replacement barriers would protect 160 and benefit 298 receptors. Additional barriers would benefit recreational land use. See attached Noise Technical Report for details.

## RIGHT OF WAY AND RELOCATIONS

**Residential Relocations:** No

**Commercial Relocations** No

**Non-Profit Relocations:** No

**Right of Way required?** No

**Septic Systems or Wells:** Not Present          **Hazardous Materials:** Not Present

  **Source:** I-95/I-395 HOV/Bus/HOT Lanes Project, Existing Conditions, March 2008

**ROW and Relocations Comments:** Minor amounts of temporary construction easements may be required along the project length for utility relocation, drainage, and construction access. No privately-owned structures are present within the right of way.

Six hazardous materials sites were identified within or adjacent to the existing right of way following searches of 31 Federal and 18 Commonwealth and local databases. All hazardous materials sites have been closed or remediated.

## CUMULATIVE AND INDIRECT IMPACTS

**Present or reasonably foreseeable future projects (highway and non-highway) in the area:** Yes

**Impact same resources as the proposed highway project (i.e. cumulative impacts):** No

**Indirect (Secondary) impacts:** No

  **Source:** VDOT Transportation Planning

**Cumulative and Indirect Impacts Comments:** Past actions (trans. proj & residential, comm, and gov. development) in the proj area have destroyed most of the historical env. resources; those remaining are degraded and fragmented. Resources will continue to be impacted by present and reasonably foreseeable actions, including extension of HOV/HOT lanes to Spotsylvania area to the south and a possible 14th St bridge across Potomac Rvr to the north. Other large-scale present and reasonably foreseeable actions include 4th-lane widening on I-95, extension of FFX Cnty Pkwy and development associated with BRAC at Fort Belvoir, and proposed residential/comm development such as Potomac Town Ctr and Woodstream. These will continue to reduce forested resources and may have added impacts on wetlands. However, the incremental impacts from this proposed proj on forested and wetland resources, when considered within the context of the cumulative impacts from past, present and reasonably foreseeable future actions, are not considered significant.

## PUBLIC INVOLVEMENT

**Substantial Controversy on Environmental Grounds:** No

  **Source:** Summary Report Citizen Information Meetings, July 23, 24, 25, 26, & 30, 2007.

**Public Hearing:** Yes **Type of Hearing:** Combined Hearing

**Other Public Involvement Activities:** Yes

**Type of Public Involvement:** Citizen Information Meetings in Alexandria, Arlington, Fairfax, Prince William, Stafford on July 23, 24, 25, 26, & 30, 2007.

**Public Involvement Comments:** The preponderance of comments from the CIM's regarded tolling, slugging, carpooling, safety issues and operation of electronic toll collection system.  There were no new environmental issues raised other than those already identified as a result of the scoping process.

## COORDINATION

**State Agencies:**

DEQ - Air Division
Department of Game and Inland Fisheries
Department of Forestry
Dept. of Mines, Minerals and Energy
Department of Health
Department of Conservation and Recreation
VA Marine Resources Commission
Department of Historic Resources
DEQ - Water Division
DEQ - Waste Division
Virginia Outdoors Foundation

**Federal Agencies:**

National Park Service
Environmental Protection Agency
NRCS
U.S. Army Corps of Engineers
U.S. Fish and Wildlife Service
US Dept. of Housing and Urban Dvlmnt.

**Local Entity:**

Stafford Parks and Recreation
Prince William County/City Planner
Stafford County/City Planner
Prince William Regional Park Authority
Northern Virginia District Regional Park Authority
Fairfax Regional Park Authority
Alexandria Parks and Recreation
Prince William Planning District
Dumfries Town/City Manager
Alexandria Economic Development Office
Arlington Economic Development Office
Fairfax Economic Development Office
Prince William Economic Development Office
Alexandria County Health Department
Fairfax County Health Department
Arlington Community Development
Fairfax County Administrator
Stafford County Administrator
Alexandria County/City Planner
Fairfax County/City Planner
Alexandria Housing Director
Alexandria Office of Transportation
Fairfax Office of Transportation
Prince William Office of Transportation
Stafford Parks and Recreation
Prince William Public Works
Dumfries Public Works
Fairfax Superintendent of Schools
Alexandria Town/City Manager
Arlington Town/City Manager
Fairfax Public Works
Arlington Parks and Recreation
Fairfax Parks and Recreation

**Other Coordination Entities:**

Northern Virginia Soil & Water Conservation Dist.
Northern Virginia Transportation Commission
Metropolitan Washington Area Transit Authority
Metropolitan Washington Council of Governments
Nothern Virginia Planning Distric Commission
Northern Virginia Regional Commission

This project meets the criteria for a Categorical Exclusion pursuant to 40 CFR 1508.4 and 23 CFR 771.117 and will not result in significant impacts to the human or natural environment.